# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THEODORE FEDEROFF, ET AL., individually and on behalf of all others similarly situated, | Civil Case No. 1:02-at-06000-UN |
| PLAINTIFFS, | CLASS ACTION COMPLAINT |
| v. | |
| GEISINGER CLINIC, a Pennsylvania non-profit corporation; GEISINGER MEDICAL CENTER, a Pennsylvania non-profit corporation; GEISINGER HEALTH PLAN, a Pennsylvania non-profit corporation; GEISINGER LEWISTOWN HOSPITAL, a Pennsylvania non-profit corporation; GEISINGER WYOMING VALLEY MEDICAL CENTER, a Pennsylvania non-profit corporation; GEISINGER SYSTEM SERVICES, a Pennsylvania non-profit corporation; GEISINGER HEALTH SYSTEM; GEISINGER BLOOMSBURG HOSPITAL, a Pennsylvania non-profit corporation; GEISINGER COMMUNITY MEDICAL CENTER, a Pennsylvania non-profit corporation; GEISINGER POTSVILLE CANCER CENTER; GEISINGER HAZELTON CANCER CENTER; GEISINGER MAIL ORDER PHARMACY; WEST SHORE ADVANCED LIFE SUPPORT SERVICES, INC., a Pennsylvania non-profit corporation; and GEISINGER | COMPLAINT FILED: November 8, 2021 |

SYSTEM FINANCIAL EDITS,                 :
                                        :
          DEFENDANTS.                   :
                                        :
                                        :

## COMPLAINT FOR INJUNCTIVE RELIEF

Plaintiffs Christine Baron, Melissa Barron, Marsha Bezuhly, Deborah Bonnell, Scott Brown, Tina M. (Eisenhauer) Buckles, Kathy Callaghan, Tammy Caswell, Jeanne Charles, Theresa Ann Chipolet, Stacey Cook, Melody Danko-Holsomback, Crystal Davis, Patricia deManincor, Mandy Dinino, Rachel Englehart-Noss, Brittany Faus, Theodore Federoff, Alexis Fetterman, Christine Lynn Finkbeiner, Kimberly Frace, Scott Fritz, Julianne Gay, Judy Good, Amy Gordon, Tara Grasley, Bethanie Gresh, Brittney Hannon, James Hannon, Barbie Harbaugh, Juliana Herrera, Archie Holsomback III, Angela Hummel, Jesseca John, Karen Karchner, Cathy Keeler, Bethany Kline-Leadbeter, Lynn Kuzmitsky, Terri Lockcuff, Gallahad Mallery, Sally Miller, Vanessa Miller, Keri Miller, Jasmine Moroskie, Amanda Mortimer, Melinda Newhart, Garry Oxenrider, Alexandra Portelli, Kristy Rittenhouse, Kristy Robinson, Briana Rolshausen, Christina Romanowski, Kim Schooley, LaRisha A. Scott, Marisa Scott, Jenelle Shellenberger, Kimberly Sipler, Tylinn Smith, Kristy Snavely, Rachel Snukis, Marni Stewart, Marjorie Swartzlander, Lori Taylor, Gabrielle Teter, Jennifer A. Thomas, Alexa Tomassacci, Jeffrey Tomassacci, Tonna Underhill, Sherryl Wagner, Bridgette M. Warford, Amy Weidner, Suzanne Wickham, Jessica Wychock, and Heather Yost

("Plaintiffs"), by and through the undersigned counsel, Gregory A. Stapp, Esquire, hereby file this Complaint for Injunctive Relief against defendants Geisinger Clinic ("GC"), Geisinger Medical Center ("GMC"), Geisinger Health Plan ("GHP"), Geisinger Lewistown Hospital ("GLH"), Geisinger Wyoming Valley Medical Center ("GWV"), Geisinger System Services ("GSS") Geisinger Bloomsburg Hospital ("GBH"), Geisinger Community Medical Center ("GCMC"), Geisinger Potsville Cancer Center ("GPCC"), Geisinger Hazelton Cancer Center ("GHCC"), Geisinger Mail Order Pharmacy ("GMOP"), West Shore Advanced Life Support Services, Inc. ("WSALSS"), and Geisinger System Financial Edits ("GSFE") ("Defendants"). In support of the claims set forth herein, Plaintiffs allege and aver as follows:

## I.    SUMMARY OF THE ACTION

1.    Without any official mandate from the federal or state government, Geisinger is mandating that all its employees, whether treating patients and working at one of their facilities or working in the IT Department from home where the employee isn't exposed to anyone other than family members or friends, be subjected to an EUA approved only PCR or Antigen test in violation of the Nuremberg Code, federal law, and the Constitution of the United States. Geisinger is enforcing this mandate regardless of the sincerely held religious convictions of those employees. The Plaintiffs seek declaratory and injunctive relief.

3

## II.   JURISDICTION AND VENUE

2.    Plaintiffs incorporate the foregoing paragraphs as is set forth in full herein. This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §1331, 28 U.S.C. §§1343(a)(3), (4), and 42 U.S.C. §1983.

3.    There exists an actual and justiciable controversy between Plaintiffs and Defendants requiring resolution by this Court.

4.    Plaintiffs have no adequate remedy at law.

5.    Venue is proper before the United States District Court for the Middle District of Pennsylvania under 28 U.S.C. §1391 because all parties reside or otherwise are found herein, and all acts and omissions giving rise to Plaintiffs' claims occurred in the Middle District of Pennsylvania.

## III.   THE PARTIES

6.    Plaintiff Christine Baron is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Baron has worked at GC for 7 years and 11 months.

7.    Plaintiff Melissa Barron is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Barron has worked for one of the above-named defendants.

8.    Plaintiff Marsha Bezuhly is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Bezuhly has worked at GMC for 16 years.

9.      Plaintiff Deborah Bonnell is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Bonnell has worked at GHP for 17 years.

10.     Plaintiff Scott Brown is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Mr. Brown has worked at GHP for 20 years.

11.     Plaintiff Tina M. (Eisenhauer) Buckles is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Buckles has worked at GMC for 30 years.

12.     Plaintiff Kathy Callaghan is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Callaghan has worked at GWV for 38 years.

13.     Plaintiff Tammy Caswell is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Caswell has worked at GMC for 16 years.

14.     Plaintiff Jeanne Charles is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Charles has worked at GSS for 21 years.

15.     Plaintiff Theresa Ann Chipolet is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Chipolet has worked at GHS for one year and ten months.

16.     Plaintiff Stacey Cook is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Cook has worked at GSACH for two years and four months.

17.     Plaintiff Melody Danko-Holsomback is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Danko-Holsomback has worked at GC

for 21 years.

18.   Plaintiff Crystal Davis is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Davis has worked at GSS for three  years.

19.   Plaintiff Patricia deManincor is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. deManincor has worked at GBH for 25 years.

20.   Plaintiff Mandy Dinino is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Dinino has worked at GSS for one year and eight months.

21.   Plaintiff Rachel Englehart-Noss is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Englehart-Noss has worked at GSS for 13-1/2 years.

22.   Plaintiff Brittany Faus is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Faus has worked at GSS for 12 years.

23.   Plaintiff Theodore Federoff is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Federoff has worked at GC for 12 years.

24.   Plaintiff Alexis Fetterman is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Fetterman has worked at GMC for six years.

25.   Plaintiff Christine Lynn Finkbeiner is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Finkbeiner has worked at GSS for 18 years.

26.     Plaintiff Kimberly Frace is a U.S. citizen and resident of the Commonwealth of Pennsylvania.  Ms. France has worked at GSS for 7-1/2 years.

27.     Plaintiff Scott Fritz is a U.S. citizen and resident of the Commonwealth of Pennsylvania.  Mr. Fritz has worked at GSS for two years.

28.     Plaintiff Julianne Gay is a U.S. citizen and resident of the Commonwealth of Pennsylvania.  Ms. Gay has worked at GMC for 12 years and 9 months.

29.     Plaintiff Judy Good is a U.S. citizen and resident of the Commonwealth of Pennsylvania.  Ms. Good has worked at GMC for 14 years.

30.     Plaintiff Amy Gordon is a U.S. citizen and resident of the Commonwealth of Pennsylvania.  Ms. Gordon has worked at GMC for 12 years.

31.     Plaintiff Tara Grasley is a U.S. citizen and resident of the Commonwealth of Pennsylvania.  Ms. Grasley has worked at GHP nine years and four months.

32.     Plaintiff Bethanie Gresh is a U.S. citizen and resident of the Commonwealth of Pennsylvania.  Ms. Gresh has worked at GSS for 16 years and 9 months.

33.     Plaintiff Brittney Hannon is a U.S. citizen and resident of the Commonwealth of Pennsylvania.  Ms. Hannon has worked at GMC for two years.

34.   Plaintiff James Hannon is a U.S. citizen and resident of the Commonwealth of Pennsylvania.  Mr. Hannon has worked at GMC for two years and eight months.

35.   Plaintiff Barbie Harbaugh is a U.S. citizen and resident of the Commonwealth of Pennsylvania.  Ms. Harbaugh has worked at GMC for two years.

36.   Plaintiff Juliana Herrera is a U.S. citizen and resident of the Commonwealth of Pennsylvania.  Ms. Herrera has worked at GMC for six years.

37.   Plaintiff Archie Holsomback III is a U.S. citizen and resident of the Commonwealth of Pennsylvania.  Mr. Holsomback has worked at GMC for 13 years.

38.   Plaintiff Angela Hummel is a U.S. citizen and resident of the Commonwealth of Pennsylvania.  Ms. Hummel has worked at GSS for five years.

39.   Plaintiff Jesseca John is a U.S. citizen and resident of the Commonwealth of Pennsylvania.  Ms. John has worked at GMC for four years and seven months.

40.   Plaintiff Karen Karchner is a U.S. citizen and resident of the Commonwealth of Pennsylvania.  Ms. Karchner has worked at GHCC for three years.

41.   Plaintiff Cathy Keeler is a U.S. citizen and resident of the Commonwealth of Pennsylvania.  Ms. Keeler has worked at GHP for six years.

42.   Plaintiff Bethany Kline-Leadbeter is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Kline-Leadbeter has worked at GHP for eight months.

43.   Plaintiff Lynn Kuzmitsky is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Kuzmitsky has worked at GHP for nine years.

44.   Plaintiff Terri Lockcuff is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Lockcuff has worked at GSS for 17-1/2 years.

45.   Plaintiff Gallahad Mallery is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Mr. Mallery has worked at GSS for 3 years and 11 months.

46.   Plaintiff Sally Miller is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Miller has worked at GSS for ten years and five months.

47.   Plaintiff Vanessa Miller is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Miller has worked at GMC for nine years.

48.   Plaintiff Keri Miller is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Miller has worked at GMC for nine years.

49.   Plaintiff Jasmine Moroskie is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Moroskie has worked at GHP for eight years.

50.    Plaintiff Amanda Mortimer is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Mortimer has worked at GHP for eight years.

51.    Plaintiff Melinda Newhart is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Newhart has worked at GCMC for nine years.

52.    Plaintiff Garry Oxenrider is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Mr. Oxenrider has worked at GMC for 11 years.

53.    Plaintiff Alexandra Portelli is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Portelli has worked at GMC for 11 years.

54.    Plaintiff Kristy Rittenhouse is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Rittenhouse has worked at GWV for three years.

55.    Plaintiff Christy Robinson is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Robinson has worked at WFH for three years.

56.    Plaintiff Briana Rolshausen is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Rolshausen has worked at GMOP for eight years.

57.    Plaintiff Christina Romanowski is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Romanowski has worked at GCMC for six years.

58.   Plaintiff Kim Schooley is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Schooley has worked at GMC for 33 years.

59.   Plaintiff LaRisha A. Scott is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Scott has worked at GMC for two years.

60.   Plaintiff Marisa Scott is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Scott has worked at WSALSS six years.

61.   Plaintiff Jenelle Shellenberger is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Shellenberger has worked at GMC for one year and four months.

62.   Plaintiff Kimberly Sipler is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Sipler has worked at GHP for five years.

63.   Plaintiff Tylinn Smith is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Smith has worked at GMC for ten months.

64.   Plaintiff Kristy Snavely is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Snavely has worked at GMC for 16 years.

65.   Plaintiff Rachel Snukis is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Snukis has worked at GHCC and GPCC for five years.

66.   Plaintiff Marni Stewart is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Stewart has worked at GHP for five years and ten months.

67.   Plaintiff Marjorie Swartzlander is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Swartzlander has worked at GMC for two years.

68.   Plaintiff Lori Taylor is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Taylor has worked at GWV for 23 years.

69.   Plaintiff Gabrielle Teter is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Teter has worked at GPH for 12 years.

70.   Plaintiff Jennifer A. Thomas is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Thomas has worked at GSS for 21 years.

71.   Plaintiff Alexa Tomassacci is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Tomassacci has worked at GC for two months.

72.   Plaintiff Jeffrey Tomassacci is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Tomassacci has worked at GMC for nine months.

73.   Plaintiff Tonna Underhill is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Underhill has worked at GLH for 4-1/2 years.

74.   Plaintiff Sherryl Wagner is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Wagner has worked at GHS for 11 years.

75.   Plaintiff Bridgette M. Warford is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Warford has worked at GSFE for eight years.

76.   Plaintiff Amy Weidner is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Weidner has worked at GMC for five years.

77.   Plaintiff Suzanne Wickham is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Wickham has worked at GMC for 14 years.

78.   Plaintiff Jessica Wychock is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Wychock has worked at GCMC for four years and eight months.

79.   Plaintiff Heather Yost is a U.S. citizen and resident of the Commonwealth of Pennsylvania. Ms. Yost has worked at GMC for 15 years and 11 months.

80.   Defendant, Geisinger Clinic, is a non-profit corporation duly organized under the laws of the Commonwealth of Pennsylvania and is engaged in the business of providing health care and services to the public, maintaining one of its places of business in Danville, Pennsylvania.

81.   Defendant, Geisinger Medical Center, is a non-profit corporation duly organized under the laws of the Commonwealth of Pennsylvania and is engaged in

13

the business of providing health care and services to the public, maintaining one of its places of business in Danville, Pennsylvania.

82.   Defendant, Geisinger Health Plan, is a non-profit corporation duly organized under the laws of the Commonwealth of Pennsylvania and is engaged in the business of providing health care and services to the public, maintaining one of its places of business in Danville, Pennsylvania.

83.   Defendant, Geisinger Lewistown Hospital, is a non-profit corporation duly organized under the laws of the Commonwealth of Pennsylvania and is engaged in the business of providing health care and services to the public, maintaining one of its places of business in Lewistown, Pennsylvania.

84.   Defendant, Geisinger Wyoming Valley Medical Center, is a non-profit corporation duly organized under the laws of the Commonwealth of Pennsylvania and is engaged in the business of providing health care and services to the public, maintaining one of its places of business in Danville, Pennsylvania.

85.   Defendant, Geisinger System Services, is a non-profit corporation duly organized under the laws of the Commonwealth of Pennsylvania and is engaged in the business of providing health care and services to the public, maintaining one of its places of business in Danville, Pennsylvania.

86.   Defendant, Geisinger Health System, is an entity duly organized under the laws of the Commonwealth of Pennsylvania and is engaged in the business of

providing health care and services to the public, maintaining one of its places of business in Danville, Pennsylvania.

87.    Defendant, Geisinger Bloomsburg Hospital, is a non-profit corporation duly organized under the laws of the Commonwealth of Pennsylvania and is engaged in the business of providing health care and services to the public, maintaining one of its places of business in Columbia, Pennsylvania.

88.    Defendant, Geisinger Community Medical Center, is a non-profit corporation duly organized under the laws of the Commonwealth of Pennsylvania and is engaged in the business of providing health care and services to the public, maintaining one of its places of business in Lackawanna, Pennsylvania.

89.    Defendant, Geisinger Pottsville Cancer Center, is an entity duly organized under the laws of the Commonwealth of Pennsylvania and is engaged in the business of providing health care and services to the public, maintaining one of its places of business in Danville, Pennsylvania.

90.    Defendant, Geisinger Hazelton Cancer Center, is an entity duly organized under the laws of the Commonwealth of Pennsylvania and is engaged in the business of providing health care and services to the public, maintaining one of its places of business in Danville, Pennsylvania.

91.    Defendant, Geisinger Mail Order Pharmacy, is an entity duly organized under the laws of the Commonwealth of Pennsylvania and is engaged in the business

of providing health care and services to the public, maintaining one of its places of business in Elysburg, Pennsylvania.

92.    Defendant, West Shore Advanced Life Support Services, Inc., is a Pennsylvania non-profit corporation duly organized under the laws of the Commonwealth of Pennsylvania and is engaged in the business of providing health care and services to the public, maintaining one of its places of business in Danville, Pennsylvania.

93.    Defendant, Geisinger System Financial Edits, is a corporation duly organized under the laws of the Commonwealth of Pennsylvania and is engaged in the business of providing health care and services to the public, maintaining one of its places of business in Danville, Pennsylvania.

## IV.   FACT ALLEGATIONS

94.    Geisinger issued a vaccine mandate for all their employees on or about August 31, 2021, advising the employees that they must submit their religious or medical exemptions by September 10, 2021.

95.    Following the submission of religious exemptions by many employees, including but not limited to, the plaintiffs, Geisinger granted some of those religious exemptions with a conditional approval.

96.    Initially, Geisinger was not advising the employees of the conditions that they would require of them as part of the approval of their religious exemptions.

97.     Eventually, Geisinger informed their employees that were granted religious exemptions from the EUA Approved only vaccines that they would be required to submit to a PCR or Antigen test twice a week on Tuesdays and Thursdays beginning on November 9, 2021.

98.     Those tests are the Quidel At-Home test kit and the Quick Vue SARS Antigen test. (See the Quidel At-Home test kit information packet and the Quick Vue SARS Antigen test information attached hereto at **Exhibit A**).

99.     Both the Quidel and the Quick Vue tests state that they have been approved by the Food and Drug Administration for Emergency Use Authorization only.

100.    As such, both tests fall under 21 U.S.C. §360bbb-3 which states that individuals are allowed to accept or reject the EUA Approved only medical product or device. See 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III).

101.    The Quick Vue SARS Antigen test states in the "Limitations" portion of its handout the following:

    a.     "Positive test results do not rule out co-infections with other pathogens."

    b.     "If the differentiation of specific SARS viruses and strains is needed, additional testing, in consultation with state or local public health departments, is required;"

c.  "Performance at the time of testing may vary depending on the variants circulating, including newly emerging strains of SARS-CoV-2 and their prevalence, which change over time;" and, most importantly

d.  **"The performance of this test has not yet been clinically validated for use in patients without signs and symptoms of respiratory infection, or <u>for serial screening applications</u> and performance may differ in these populations."**

102.  The Quidel At-Home COVID-19 Test states that testing should be performed in an area with adequate ventilation.  It also states, "The Reagent Solution contains harmful chemicals (see table below).  If the solution contacts the skin or eye, flush with copious amounts of water.  If irritation persists, seek medical advice: <u>https://www.poison.org/contact -us or 1-800-222-1222</u>."

103.  The Quidel At-Home test kit utilizes nasal swabs made by Puritan.  The instructions state, "Do not touch swab tip when handling the swab."  Those nasal swabs contain Ethylene Oxide according to the information obtained by one of the plaintiffs from Puritan directly. (See the Puritan Information at **Exhibit B**).

104.  Puritan, the company that manufactures the nasal swabs for the tests being provided by the Defendants to comply with the policy, published a Memorandum entitled, "RE: Concerns Regarding Ethylene Oxide as a Method of

Sterilization." In the memorandum, Puritan states, "Ethylene Oxide does possess mutagenic properties and is classified as a human carcinogen by the International Agency for Research on Cancer. Ethylene Oxide may also form Ethylene Chlorohydrin, which is **toxic.**"

105. According to the National Cancer Institute, Ethylene Oxide has the ability to damage DNA making it an effective sterilizing agent but also accounts for its cancer-causing activity.

106. The National Cancer Institute handout on Ethylene Oxide states, "The primary routes of human exposure to ethylene oxide are inhalation and ingestion, which may occur through occupational, consumer, or environment exposure. Because ethylene oxide is highly explosive and reactive, the equipment used for its processing generally consists of tightly closed and highly automated systems, which decreases the risk of occupation exposure." (See the handout attached at **Exhibit C**). In the present case, the Defendants are asking the Plaintiffs to voluntarily place this chemical up their nose twice a week even though it is described as a carcinogen and "toxic."

107. According to the National Toxicology Program at the Department of Health and Human Services, "An increased risk of cancer has been demonstrated in epidemiological studies of workers using ethylene oxide as a sterilant for medical

devices and spices and in chemical synthesis and production." (See the handout attached at **Exhibit D**).

108.   The DHHS statement on ethylene oxide goes on to state, "Exposure by dermal contact is expected to be low under most circumstances." Yet, in the present case the Defendants are requiring the Plaintiffs to subject themselves to dermal contact twice a week.

109.   Defendant's policy states that for vaccinated employees, "If Extended PTO hours are exhausted, a fully or partially vaccinated employee may utilize the "COVID-19 Paid Absence" pay code for the remainder of their absence required by Employee Health as a result of the employee's documented COVID-19 positive test." This pay code means the vaccinated employees are paid without having to use their personal time off.

110.   For unvaccinated employees the policy states, "If Extended PTO hours are exhausted, an unvaccinated employee will then utilize Personal Holiday hours, Primary PTO hours, or unpaid time for the remainder of their required missed work time until cleared to return to work by Employee." Defendant's policy requires unvaccinated employees to use personal PTO time if they miss time from a COVID-19 infection rather than getting access to the pay code described above for vaccinated or partially vaccinated employees.

111.   The Defendant has also implemented a policy for their employees if they are exposed to COVID-19, even if they don't have any symptoms.  If you are vaccinated when you are exposed to COVID-19, you may report to work as normal. If you are unvaccinated, you receive an automatic 14-day quarantine.

112.   DHHS authorized the emergency use of the polymerase chain reaction ("PCR") test as a diagnostic tool for COVID-19, with disastrous consequences. The PCR tests are themselves experimental products, authorized by the FDA under separate EUAs. PCR test manufacturers use disclaimers like this in their product manuals: "[t]he FDA has not determined that the test is safe or effective for the detection of SARS-Co-V-2." Manufacturer inserts furnished with PCR test products include disclaimers stating that the PCR tests should NOT be used to diagnose COVID-19. This is consistent with the warning issued by the Nobel Prize winning inventor of the PCR test that such tests are not appropriate for diagnosing disease.

113.   In an article entitled, *"Has Provincetown Become Protease Town,"* New York Native, by John Lauritsen, December 9, 1996, Kary Mullis, the inventor who won a Nobel Prize in Science for inventing the PCR test discussed the test itself. With regard to the viral load tests, which attempt to use PCR for counting viruses, Mullis has stated:  "Quantitative PCR is an oxymoron." PCR is intended to identify substances qualitatively, but by its very nature is unsuited for estimating numbers. Although there is a common misimpression that the viral load tests actually count

21

the number of viruses in the blood, **these tests cannot detect free, infectious**

**viruses at all**; they can only detect proteins that are believed, in some cases wrongly,

to be unique to HIV. **The tests can detect genetic sequences of viruses, but not**

**viruses themselves."**

114.   The way in which the PCR tests are administered guaranties an

unacceptably high number of false positive results. Cycle Threshold Value ("CT

value") is essentially the number of times that a sample (usually from a nasal swab)

is magnified or amplified before a fragment of viral RNA is detected. The CT Value

is exponential, and so a 40-cycle threshold means that the sample is magnified

around a trillion times. The higher the CT Value, the less likely the detected fragment

of viral RNA is intact, alive, and infectious.[1]

115.   Virtually all scientists, including Dr. Fauci, agree that any PCR test run

at a CT value of 35-cycles or greater is useless. Dr. Fauci has stated (emphasis below

added):

> What is now evolving into a bit of a standard is that if you get a
> cycle threshold of 35 or more that the chances of it being
> replication competent are miniscule… We have patients, and it
> is very frustrating for the patients as well as for the physicians...
> somebody comes in and they repeat their PCR and it's like 37
> cycle threshold... you can almost never culture virus from a 37
> threshold cycle. So, I think if somebody does come in with 37,

---

[1]   https://www.oralhealthgroup.com/features/the-problems-with-the-covid-19-test-a-necessary-understanding/ (last visited July 15,2001).

38, even 36, you gotta say, you know, it's dead nucleotides, period. In other words, it is not a COVID-19 infection.[2]

116.   A study funded by the French government showed that even at 35-cycles, the false positivity rate is as high as 97%. Despite this, a majority of the PCR tests for COVID-19 deployed under EUAs in the United States are run at 35-45 cycles in accordance with manufacturer instructions. Under the EUAs issued by the FDA, there is no flexibility to depart from the manufacturer's instructions and change the way in which the test is administered or interpreted. The chart below shows that all major PCR tests in use in the United States are run at cycles of up to 35 or higher.

| Manufacturer | Manufacturer's Recommended Cycle Threshold |
|---|---|
| Xiamen Zeesan SARS-CoV-2 Test Kit (Real-time PCR) | 45 cycles |
| Opti Sars CoV-2 RT-PCR Test | 45 cycles |
| Quest SARS-CoV-2rRT-PCR Test | 40 cycles |
| CDC 2019-Novel Coronavirus Real Time (RT-PCR Diagnostic Panel) Test | 40 cycles |
| Wren Labs COVID-19 PCR Test | 38 cycles |
| LabCorp COVID-19 RT-PCR Test | 35 cycles |

117.   Further, the Defendants and their counterparts in state governments used the specter of "asymptomatic spread" — the notion that fundamentally healthy people could cause COVID-19 in others — to justify the purported emergency. But

---

[2] https://1027kearneymo.com/kpgz-news/2020/11/9/covid-tests-may-inflate-numbers-by-picking-up-dead-virus (last visited July 15, 2021)

there is no credible scientific evidence that demonstrates that the phenomenon of "asymptomatic spread" is real. On the contrary, on June 7, 2020, Dr. Maria Von Kerkhov, head of the WHO's Emerging Diseases and Zoonosis Unit, told a press conference that from the known research, asymptomatic spread was "very rare." "From the data we have, it still seems to be rare that an asymptomatic person actually transmits onward to a secondary individual." She added for emphasis: "it's very rare."

118.   Researchers from Southern Medical University in Guangzhou, China, published a study in August 2020 concluding that asymptomatic transmission of COVID-19 is almost non-existent. "Asymptomatic cases were least likely to infect their close contacts," the researchers found. A more recent study involving nearly 10 million residents of Wuhan, China found that there were no — zero — positive COVID-19 tests amongst 1,174 *close contacts* of asymptomatic cases, *indicating the complete absence of asymptomatic transmission.*

119.   On September 9, 2020, Dr. Fauci was forced to admit in an official press conference:

> [E]ven if there is some asymptomatic transmission, in all the history of *respiratory borne viruses of any type, asymptomatic transmission has never been the driver of outbreaks. The driver of outbreaks is always a symptomatic person, even if there is a*

*rare asymptomatic person that might transmit, an epidemic is not driven by asymptomatic carriers.[3]*

120.   As a result of the Plaintiffs sincerely held religious beliefs, which range from not wishing to participate in an ongoing study of an EUA Approved only medical device or product in violation of the Nuremberg Code, Title 45, CFR Part 46, to being made in the image of God, they requested an exemption from the PCR or Antigen tests via email to the Human Resources Department.

121.   Defendants have rejected most, if not all, of the plaintiff's religious exemption requests to the PCR or Antigen tests as of the time of the filing of this complaint.

122.   Plaintiffs have been advised by the Defendants that each day that they fail to submit to a PCR or Antigen test it will be considered as a declination of the accommodations offered and that they will have voluntarily resigned from their employment with Geisinger.

123.   Once an employee has failed to take the PCR or Antigen test on three separate occasions, they will be constructively discharged.

124.   The first date that Plaintiffs will be required to submit to a PCR or Antigen test is November 9, 2021.

---

[3] https://www.statnews.com/2021/01/23/asymptomatic-infection-blunder-covid-19-spin-out-of-control (last visited July 15, 2021).

125. If Plaintiffs fail to submit to three tests on November 9, 2021, November 11, 2021, and November 16, 2021, they will be fired on November 16, 2021.

## COUNT I
### (Violation of First Amendment Right to Free Exercise of Religion)

126. Paragraphs one through 125 are incorporated herein.

127. The First Amendment provides, in relevant part, "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." This Free Exercise Clause "protects religious observers against unequal treatment and subjects to the strictest scrutiny laws that target the religious for special disabilities based on their religious status…Applying that basic principle, this Court has repeatedly confirmed that denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion that can be justified only by a state interest of the highest order." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S.Ct. 2012, 2019 (2017) (Internal citation and quotation marks omitted).

128. The Free Exercise Clause also guarantees an affirmative right to practice sincerely held religious beliefs.

129. The Defendants granted the Plaintiffs their religious exemptions to avoid being subjected to one of the three EUA Approved only vaccines, only to provide "conditional approval", which conditions include having to participate in a

26

PCR test or Antigen test twice a week on Tuesdays and Thursdays, wearing masks, and being quarantined for longer periods of time than their vaccinated coworkers while also being required to use their own PTO time if they have to be quarantined as a result of an exposure to COVID-19.

130.   Defendant's conditional approval requires the Plaintiffs to be subjected to the PCR tests or Antigen tests beginning on Tuesday, November 9, 2021.

131.   If the Plaintiff or Plaintiffs fail to subject themselves to a PCR test or Antigen test on three separate occasions they will constructively discharged.

132.   As such, if  Plaintiff or Plaintiffs fail to subject themselves to a PCR test or Antigen test on November 9, November 11, and November 16, 2021, they will be constructively discharged.

133.   Thus, the Plaintiffs respectfully request the Court to issue an injunction enjoining the enforcement of Defendant's policy **by no later than 5 PM on Monday, November 15, 2021, so that they can keep their jobs and careers while their quest for judicial relief remains pending.**

134.   The Defendant's PCR test and Antigen test mandate violates the Free Exercise Clause by failing to grant the Plaintiff's religious exemption requests.

135.   The Defendant's PCR test and Antigen test requirement twice a week violates the Free Exercise Clause by forcing Plaintiffs and all Geisinger employees

who have been granted a conditional approval to their religious exemption request to choose between their religious beliefs and their jobs and careers.

## COUNT II
### (Violation of First, Fourth, Fifth, and Fourteenth Amendment Rights to Privacy and Medical Freedom)

136.   Paragraphs 1 through 135 of this Complaint are incorporated herein.

137.   In *Roe v. Wade*, 410 U.S. 113 (1973) and *Planned Parenthood v. Casey*, 505 U.S. 833 (1992), the United States Supreme Court established a woman's right to terminate her pregnancy under the First, Fourth, Fifth, and Fourteenth Amendments.  The principles derived from these cases establish a broad right to freedom to make personal choices – central to personal dignity and autonomy – about one's own medical decisions.

138.   The Defendant's conditional approval to the COVID-19 religious exemption requests that now require submission to a PCR or Antigen test twice a week places an undue burden on the Plaintiff's right to make personal choices – central to their personal dignity and autonomy – about their own medical decisions.

139.   As stated above, the PCR and Antigen tests being required by the Defendant both contain ethylene oxide, a carcinogen, on the nasal swab which Plaintiffs are required to place inside their body.

140.   Thus, the Defendant's conditional approval requiring the twice weekly submission to a PCR or Antigen test violates the First, Fourth, Fifth, and Fourteenth Amendments on its face.

## COUNT III
### (Religious Discrimination)

141.   Paragraphs 1 through 140 of this Complaint are incorporated herein.

142.   Title VII prohibits "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Xiaoyan Tang v. Citizens Bank, N.A.*, 821 F.3d 206, 215 (1st Cir. 2016) quoting from 42 U.S.C. § 2000e–2(a)(1).

143.   Defendant had a duty to "[O]ffer a reasonable accommodation to resolve a conflict between an employee's sincerely held religious belief and a condition of employment, unless such an accommodation would create an undue hardship for the employer's business." *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 133 (1st Cir. 2004).

144.   Once an employee demonstrates that their religious belief conflicts with an employment condition, "the burden then shifts to the employer to show that it offered a reasonable accommodation or, if it did not offer an accommodation, that doing so would have resulted in undue hardship." *Id.*

145.  Plaintiffs requesting religious accommodations submitted a request for religious accommodation to the defendant's conditional approval policy requiring unvaccinated employees to submit to a PCR or Antigen test twice weekly, informing defendant that its policy was in conflict with their sincerely held religious beliefs.

146.  These requests were submitted via email to the Defendants.

147.  Defendants neither offered to accommodate the plaintiffs nor showed that an accommodation would have resulted in "undue hardship."

148.  Despite failing to assert an undue hardship, defendant in fact would not be "unduly burdened" or face hardship in accommodating plaintiffs' requests, not only because it would not financially or operationally burden defendant to accommodate plaintiffs, but because the PCR or Antigen tests are not effective in determining whether an individual is infected with COVID-19.

149.  Defendant also failed to engage in any meaningful discussion, interactive process or appeal with the plaintiffs who requested reasonable accommodations.

150.  All plaintiffs were and are ready, willing, and able to abide by any reasonable accommodations to defendant's policy.

151.  Plaintiffs are all facing adverse employment action, namely being terminated, due to their inability to adhere to the defendant's policy because of their religious beliefs.

## COUNT IV
### (Violation of the Equal Protection Clause)

152.   Paragraphs 1 through 151 of this Complaint are incorporated herein.

153.   The equal protection clause of the Fourteenth Amendment guarantees that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

154.   The Defendant's actions in granting religious exemptions to employees who have a sincerely held religious belief that does not allow them to participate in the study of EUA Approved only vaccines by granting conditional approvals which require Plaintiffs to subject themselves on a regular basis to a carcinogen and to use PTO time, if and when, they may be exposed to COVID-19, as well as, having to be quarantined for 14 days if exposed to a person who has tested positive for COVID-19 is a violation of the Equal Protection Clause.

155.   Plaintiffs believe and therefore aver that the Defendants are treating unvaccinated employees with a sincerely held religious belief that does not allow them to be injected with one of the three EUA Approved only vaccines differently than vaccinated employees.

156.   This violates the Plaintiffs right to equal protection under the law in which to practice their sincerely held religious beliefs.

## COUNT V
### (Civil Rights Conspiracy)

157.   Paragraphs 1 through 156 of this Complaint are incorporated herein.

158.   Title 42 U.S.C. §1985(3) permits recovery of damages if a plaintiff can prove a conspiracy "for the purpose of depriving either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." *See Mian v. Donaldson, Lufkin & Jenrette Securities Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993) (evidence of "racial or perhaps otherwise class-based, invidious discriminatory animus" required to prevail on §1985 claim).

159.   In the present case, the Plaintiffs believe, and therefore aver, that they are being targeted as a class of individuals with sincerely held religious beliefs that do not allow them to take the EUA Approved only vaccines being offered by Pfizer, Moderna and Johnson and Johnson.   Essentially, the Defendants are targeting unvaccinated employees.

160.   The Plaintiffs believe, and therefore aver, that they are being retaliated against based upon their sincerely held religious beliefs.

## COUNT VI
### (Retaliation)

161.   Paragraphs 1 through 160 of this Complaint are incorporated herein.

162.   All plaintiffs were engaged in a protected activity, whether requesting accommodation for religious beliefs or for disability.

163.   Defendants have taken adverse action against plaintiffs, informing them that they will be constructively discharged after failing to submit to a PCR or Antigen tests on three separate occasions resulting in termination on November 16, 2021, if they do not comply with Defendant's policy, which would result in a violation of conscience (Title VII plaintiffs).

164.   The adverse action taken by Defendants would not have occurred but for a retaliatory motive against plaintiffs for requesting their respective accommodations.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter judgment on their behalf and that of the Class by adjudging and decreeing that:

A.   Declaration that Defendants violated Title VII in discriminating against Plaintiffs by failing to offer reasonable accommodation for their religious beliefs;

B.   Enjoin Defendants from taking adverse employment action against Plaintiffs;

33

C.   Enjoin Defendants from enforcing its PCR or Antigen test policy against Plaintiffs until their religious beliefs are accommodated, until the Plaintiffs have an opportunity to file with the EEOC and the EEOC completes its investigation and/or issues every plaintiff a right to sue, and/or a verdict is rendered by a jury; and

D.   Attorney fees and costs, plus any other relief this Court deems proper.

Dated: November 8, 2021                         **STAPP LAW, LLC**

                                          By: */s/ Gregory A. Stapp*
                                               Gregory A. Stapp, Esquire
                                               Attorney No. 78247
                                               153 West Fourth Street, Suite 6
                                               Williamsport, PA 17701
                                               Tel. (570) 326-1077
                                               Email: gstapp@stapplaw.net
                                               *Attorney for Plaintiffs*