## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THEODORE FEDEROFF, *et al.*, | No. 4:21-CV-01903 |
| Plaintiffs, | (Chief Judge Brann) |
| v. | |
| GEISINGER CLINIC, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

### NOVEMBER 23, 2021

Federal courts have tremendous power, but limited jurisdiction. Federal judges are not entitled to intervene any time that parties believe they have been treated unfairly. We wear robes, not crowns.

Our role is transcribed. For federal judges to provide relief, parties must first show that they have an enforceable right. And if there's no right, there can be no remedy.

Believing that they have been treated unfairly, some 100 unvaccinated Geisinger Health Employees have attempted to put the efficacy of their employer's COVID-19 program on trial. To remedy their unfair treatment under this program, the Employees ask that I commandeer their employer's vaccination policy—and issue a preliminary injunction that either exempts them from their employer's

unvaccinated employee testing requirement or require that the vaccinated employees be tested as well.

Yet in this effort, they have neglected to show that they have a right that would justify this extraordinary action. While their claims invoke religious discrimination, their focus is on the "science." Now, I'll admit, some of what they cite seems to have merit. Though I'd be remiss if I didn't note that the vast majority of their case appears to reflect a toxic combination of motivated reasoning and misinformation—a cocktail that that promises to plague this country long after COVID-19 has abated.

But, in the end, the Employers' take on the "science" is irrelevant absent a right. And here, the Geisinger Employees have utterly failed to demonstrate that they have one. That renders their claim dead-on-arrival.

But before I dive into the legal deficiencies of their claims, a bit of background and an explanation of the legal standard applied to their requested relief are in order.

## I.    BACKGROUND

On November 8, 2021, just over 100 healthcare workers sued Geisinger Health and its various affiliates. As I previewed, their case centers on Geisinger's COVID-19 vaccination policy—more specifically, Geisinger's failure to provide an exemption-to-the-exemption.

These 100-plus Geisinger employees had been given conditional religious exemptions to Geisinger's COVID-19 vaccination requirement.[1] But Geisinger began requiring that these unvaccinated Employees submit to COVID-19 tests twice a week, beginning November 9, 2021.[2] And Geisinger's testing policy provides that if the Employees do not submit to the tests, they will be fired.[3] The Employees asked for a religious exemption to the testing requirement.[4] But Geisinger rejected these requests.[5]

In their initial complaint, the Employees argued that Geisinger's failure to provide an exemption to the testing requirement violated their rights under the United States Constitution and Federal Civil Rights Law and asked that I block the requirement or require that all vaccinated staff be tested as well.[6] On November 14, 2021, the employees filed an amended complaint adding an additional count and correcting various technical errors.[7] The following day, I held a telephone status conference. During that call I scheduled an oral argument. I also requested that the parties brief a number of issues raised in the amended complaint: namely, whether Geisinger—a private, non-profit hospital—was a state actor and thus capable of violating the employees' constitutional rights; whether Geisinger could be sued for

---

[1]   Doc. 14 at ¶ 127.
[2]   *Id.* at ¶ 129.
[3]   *Id.* at ¶¶ 154–155.
[4]   *Id.* at ¶ 152.
[5]   *Id.* at ¶ 153.
[6]   *See generally* Doc. 1.
[7]   *See generally* Doc. 10.

these violations under 42 U.S.C. § 1985(3); and whether administrative exhaustion requirements barred the Employees from bring their claims under Federal and State civil rights law.

On November 17, 2021, the Employees filed a Second Amended Complaint.[8] In this complaint, which again asks this Court to enjoin Geisinger from implementing their testing program or, in the alternative, require that all employees be tested, the employees altered their legal theory.[9] They jettisoned some of their federal constitutional claims, as well as their section 1985 claim; but added claims under the Pennsylvania State Constitution's Free Exercise Clause and the Pennsylvania Human Relations Act.

The parties submitted briefs addressing the claims, requested relief, and topics I asked that they address on November 18, 2021. And on November 19, 2021, I heard oral argument on the same subjects.

The Employees request for a preliminary injunction is now ripe for review.

## II.   LEGAL STANDARD

The Geisinger Employees' requested relief—that I issue a preliminary order that requires Geisinger not to implement their testing program or, alternatively, that Geisinger test all employees—dictates the legal standard applied. This request falls under Federal Rule of Civil Procedure 65, which governs the granting of injunctive

---

[8]     *See generally* Doc. 14.
[9]     *See generally id.*

relief such as temporary restraining orders and preliminary injunctions. By design, this relief is extraordinary in nature and available only in limited circumstances.[10]

The United States Court of Appeals for the Third Circuit has outlined four factors that a court ruling on a request for injunctive relief must consider: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest.[11] These same factors apply with equal force to a motion for a temporary restraining order.[12]

In *Reilly v. City of Harrisburg*, the Third Circuit clarified the burden on a party seeking a preliminary injunction.[13] The court specified that a party seeking a preliminary injunction must first demonstrate the following: (1) "it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not)," and (2) "it is more likely than not to suffer irreparable harm in the absence of preliminary relief."[14] And the Third Circuit further noted that "[i]f these gateway factors are met, a court then considers the remaining

---

[10]   *See AT&T v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1426–27 (3d Cir. 1994), *cert. denied*, 514 U.S. 1103 (1995).

[11]   *Talbert v. Corizon Medical*, 605 Fed. Appx. 86, 87 (3d Cir. 2015).

[12]   *Cerro Fabricated Products LLC v. Solanick*, 300 F. Supp. 3d 632, 648 n.5 (M.D. Pa. 2018) (Mariani, J.).

[13]   858 F.3d 173 (3d Cir. 2017).

[14]   *Id*. at 179.

two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief."[15]

## III.   ANALYSIS

So with these two threshold factors in mind, I can turn now to the merits. Across three counts, the Geisinger Employees invoke a right to an exemption from their Employer's testing policy under five separate laws. These five claims can be broken out into two categories.

First, there are their claims under Federal and State Antidiscrimination laws. Namely:

- Title VII of the 1964 Civil Rights Act, codified at 42 U.S.C. § 2000e, prohibiting employers from discriminating on the basis of religion;[16] and

- the Pennsylvania Human Relations Act, specifically 43 P.S. § 955(5)(f), Though as I noted at the oral argument, this section citation appears to be an error. The material they quote comes from 43 P.S. § 955(f). And even that section does not appear to be correct as it pertains only to "employment agencies." Accordingly, I'll generously construe this allegation as alleging religious discrimination against an "employer" under 43 P.S. § 955(a).[17]

---

[15]   *Id.*
[16]   Doc. 14 at ¶ 161, 184.
[17]   *Id.* at ¶ 162.

Second, there are their constitutional claims. These include:

- The Equal Protection Clause of the United States Constitution's 14th Amendment;[18]

- the Pennsylvania State Constitution's Free Exercise Clause, found in Article I, Section 3;[19] and

- the Free Exercise Clause of the United States Constitution's 1st Amendment.[20]

I'll note here that besides serving as a basis for the Employees substantive claims—in other words, claims that entitle them to a right, which are assessed here based on the likelihood that they'd succeed at an eventual trial—these constitutional claims are also at the heart of the Employees' claim that absent a preliminary injunction they will suffer an irreparable harm—the justification required for this Court to intervene now.

As I'll explain further in the subsections below, the Geisinger Employees' claims fail across the board. To start, the Employees are far from showing that they are likely to succeed on the merits. Well-established law forecloses their claims.

First, they assert constitutional claims against a private entity without so much as a paragraph describing how Geisinger could be considered a state actor. In fact, they disavow any governmental connection in the first paragraph of their complaint—writing that Geisinger is mandating that its employees be subjected to

---

[18]   *Id.* at ¶¶ 173–184.
[19]   *Id.* at ¶ 162.
[20]   Doc. 18 at 19.

COVID-19 tests "[w]ithout any official mandate from the federal or state government. . . ."[21] In total, these claims reflect a fundamental misunderstanding of the rights afforded under the Constitution—a failing of civic education that I might sadly expect from a ordinary citizen, but which is inexcusable from a member of the bar.

Second, while the Geisinger Employees are in the right area code in alleging that Geisinger violated their rights under federal and state antidiscrimination law—in the sense that you can sue a private, non-state actor under these statutes—their allegations fail to touch on these statutes' most basic requirements.[22] To make out a prima facie case of religious discrimination, the Geisinger Employees must tell the Court what their religious belief is. They have not done so. And this failing alone would warrant dismissal.

But this is not the sole infirmity of these claims. Indeed, it's not clear that this Court can even entertain these claims. The antidiscrimination statutes require that employees first file their complaint with either the Pennsylvania Human Relations Commission or the Equal Employment Opportunity Commission.[23] The Geisinger Employees have not done so. And while courts disagree about whether trial court judges are even empowered to issue a preliminary injunction absent a filed

---

[21] Doc. 14 at ¶ 1.
[22] *See id.* at ¶¶ 161–162 & 184.
[23] *See* 42 U.S.C. § 2000e-5(b), (e)(1).

complaint—the Third Circuit has yet to weigh in—what's clear is that the Geisinger Employees would not meet the standard under the most permissive approach.[24]

If these failings—which would sink the Geisinger Employees' claim based on their inability to show a likelihood of success on the merits—weren't enough, the Employees also fail to show that they would suffer irreparable harm. In their papers, and at oral argument, the Employees put forward two arguments. Their first basis: the loss of their jobs and career. Their second: the loss of their constitutional rights. But both fail.

First, well-established Supreme Court and Third Circuit precedent dictates that the loss of a job alone does not constitute irreparable harm.[25] This harm can be remedied after trial; in employment discrimination cases, courts are empowered to reinstate wrongfully terminated employees, order backpay, and award damages.

Second, as I have noted above—and will discuss further below—the Employees do not have a bona fide constitutional claim. Geisinger is not a state actor. They therefore cannot violate the Employees' rights under the Free Exercise and Equal Protection Clauses.

---

[24]   *See e.g. Wagner v. Taylor*, 836 F.2d 566 (D.C. Cir. 1987); *Bacon v. Woodward*, 2021 WL 5183059 (E.D. Wa. Nov. 8, 2021); *Doe v. Mills*, 2021 WL 5027177 (1st Cir. Oct. 29, 2021).

[25]   *See Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974); *Marxe v. Jackson*, 833 F.2d 1121 (3d Cir. 1987).

Plaintiffs must clear a high bar to be entitled to a preliminary injunction. It is an extraordinary remedy. And, as I have previewed, the Employees are far from making the sort of showing that would justify this relief.

### A.   The State and Federal Free Exercise Claims and 14th Amendment Equal Protection Claim

I'll begin with the Geisinger Employees' constitutional claims. In their papers and at oral argument, the Employees claim that their constitutional rights have been violated. For instance, in arguing that they have suffered irreparable harm, they highlight Supreme Court caselaw holding that the loss of First Amendment is an irreparable injury.[26] At the same time, the Employees also claim, in Count II, that Geisinger's failure to provide a testing exemption violates the 14th Amendment Equal Protection Clause.[27] And they similarly reference Art. I, Section 3 of the Pennsylvania State Constitution, the state Free Exercise Clause, in Count I.[28] But nowhere—not in their complaint, not in their briefing, and not at oral argument— have they claimed that Geisinger is a state actor.

The Bill of Rights is a compact between the federal government and the people. In ratifying the Constitution and these Amendments, the people did not fundamentally alter their rights against each other. This is evident in the text of the First Amendment. It provides that "Congress shall make no law respecting an

---

[26]   Doc. 18 at 19 (citing *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020)).
[27]   Doc. 14  at ¶¶ 173–182.
[28]   *Id.* at ¶ 162.

establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and petition the Government for a redress of grievances."[29] The key words there are "*Congress* shall make no law . . . ." Indeed, "[a]s is plain from its text, the First Amendment was adopted to curtail the power of *Congress* to interfere with the individual's freedom to believe, to worship, and to express himself in accordance with the dictates of his own conscience."[30] And while the Supreme Court has expanded the First Amendment's reach—a federal agency cannot interfere with the right to Free Exercise any more than Congress, and neither can state or local government officials after incorporation—governmental conduct remains a non-negotiable element.[31]

A similar dynamic is at play with the Fourteenth Amendment, the other federal constitutional protection that the Employees invoke. Passed in the wake of the Civil War, this Amendment gave the people greater rights against their state. Section 1 provides that "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of the law; nor deny to any person within its jurisdiction the equal protection of the law."[32] By its

---

[29]   U.S. Const. amend. I.
[30]   *Wallace v. Jaffee*, 472 U.S. 38, 49 (1985) (emphasis added).
[31]   *See id.*
[32]   U.S. Const. amend. XIV, § 1.

- 11 -

very terms, the Equal Protection Clause restrains the State—not private individuals. This limitation was recognized shortly after the Amendment went into effect in the landmark *Civil Rights Cases*.[33]

Confusion over the rights provided under the Pennsylvania Constitution is a bit more understandable—for an ordinary citizen. Its Free Exercise Clause provides that

> All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; no man can of right be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent; no human authority can, in any case whatever, control or interfere with the rights of conscience, and no preference shall ever be given by law to any religious establishments or modes of worship.[34]

But while the Article I, Section 3 of the Pennsylvania State Constitution makes no mention of state action, the Pennsylvania Supreme Court has emphasized that Article 1 and its 26 sections "must be read as limiting the powers of *government* to interfere with the rights provided therein."[35]

In short, these provisions do not give the Employees the rights that they think they do. A cursory understanding of our constitutional system—and in the case of the claims under the First and Fourteenth Amendment, a mere glance at the text—

---

[33]   109 U.S. 3 (1883). Notably, this decision also required state action to satisfy claims under the Thirteenth Amendment despite the lack of reference to "State" in the Amendment. That aspect of the decision was eventually overturned. *See Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968). But the requirement under the Fourteenth Amendment remains.

[34]   Pa. Const., art. I, § 3.

[35]   *Shapp v. Nat'l Gettysburg Battlefield Tower*, 311 A.2d 588, 592 (Pa. 1973) (emphasis added).

should have put them on notice that these Amendments do not apply with equal force to private parties. And while a private party's conduct can wade into state action where their act is "fairly attributable" to the state, the Geisinger Employees do not make that case here. To the contrary, they assert that Geisinger enacted its policy "[w]ithout any official mandate from the federal or state government . . . ."[36] That seals their fate.

As pled, the Employees' constitutional claim have no zero chance of success on the merits.

## B.     Title VII Claims

The Geisinger Employees also claim, in Count I and Count III, that Geisinger's failure to provide an exemption-to-the-exemption violates Title VII of the Civil Rights Act of 1964. Title VII "makes it an unlawful employment practice for an employer 'to discharge any individual, or otherwise to discriminate against any individual with respect to his compensations, terms, conditions, or privileges of employment, because of such individual's . . . religion.'"[37] Congress further defined "religion" in the statute—and in doing so, cabined this potentially expansive term: "The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonable

---

[36]    Doc. 14 at ¶ 1.
[37]    *Fallon v. Mercy Cath. Med. Ctr. of Se. Pa*, 877 F.3d 487, 490 (3d Cir. 2017).

accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."[38]

In striking this statutorily required balance between the right of employees to practice their religion and the right of employers to carry out their business, courts have used a two-part framework. The burden is first on the employees to make out a prima facie case. They must show "that (1) [they] held a sincere religious belief that conflicted with a job requirement, (2) [they] informed [their] employer of the conflict, and (3) [they were] going to be disciplined for failing to comply with the conflicting request."[39]

If the employees establish these factors, the burden then shifts to the employer, who can defeat the employees' prima facie case by showing that it either offered an accommodation or that making such an accommodation would have been an "undue hardship."[40] Supreme Court and Third Circuit precedent dictate that this showing is minimal: "An accommodation constitutes an 'undue hardship' if it would impose more than a de minimis cost on the employer."[41]

The Geisinger Employees have asked that, pending the outcome of their case, I bar Geisinger from implementing its testing policy or expand it to all employees, regardless of vaccination status. Let me reiterate: this is an extraordinary remedy.

---

[38]   *Id.* (quoting 42 U.S.C. § 2000e(j)).
[39]   *Id.*
[40]   42 U.S.C. 20000e(j).
[41]   *Webb v. City of Philadelphia*, 562 F.3d 256, 259–60 (3d Cir. 2009) (Scirica, J.) (citing *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977)).

For it to be warranted, the employees must—among other things—show a that they are likely to win. Here, that would require the Employees to show that the administrative exhaustion requirements have been satisfied, or are inapplicable; and that they have a sincere, religious conflict with the testing requirement. If the Employees meet this burden, Geisinger would then be required to show that offering an exemption-to-the-exemption would "impose more than a de minimis cost . . . ."[42]

### 1. Exhaustion

Title VII—and our anti-discrimination laws more broadly—exist within a broader scheme. Federal court cannot be an employee's first resort. They must first file with the Equal Employment Opportunity Commission (EEOC) or a state agency.[43] That agency is then tasked with the initial investigation, and regardless of what they find, the employee "is entitled to a 'right-to-sue' notice 180 days after the charge is filed."[44] (And sometimes the EEOC issues the right-to-sue order sooner.)[45]

---

[42] *Id.*

[43] 42 U.S.C. § 2000e-5(b), (e)(1). "In establishing these procedures, Congress acted on the assumption that 'administrative tribunals are better equipped to handle the complicated issues involved in employment discrimination cases. . . . [and that] the sorting out of the complexities surrounding employment discrimination can give rise to enormous expenditures of judicial resources in already heavily overburdened Federal district courts.'" *Moteles v. Univ. of Pennsylvania*, 730 F.2d 913, 917 (3d Cir. 1984) (quoting H.R. Rep. No. 238, 92d Cong., 2d Sess. 2 *reprinted in* 1972 U.S. Code Cong. & Ad. News 2137, 2146). *See also Waiters v. Parsons*, 729 F.2d 233, 237 (3d Cir. 1984) (noting that the statutory scheme "reflects an attempt to balance the competing value of protecting the right of employees to nondiscriminatory treatment, and of avoiding the cost of litigation over discriminatory employment decisions that might be rectified by a consensual agreement.").

[44] *Fort Bend Cty., Tx. v. Davis*, 139 S. Ct. 1843, 1847 (2019).

[45] *See Together Employees v. Mass General Brigham Inc.*, 2021 WL 5234394, at *19 (D. Mass. Nov. 11, 2021) (noting that plaintiffs in a case challenging a Massachusetts healthcare organization's vaccine that the EEOC had issued right-to-sue letters because the agency did not believe it would complete its processing within 180 days).

What's essential here: an employee is only entitled to bring a private right of action under Title VII after they have received that notice.[46]

Here, the Geisinger Employees do not meet the mark. At oral argument, counsel for the Employees indicated that he was not aware of any Employees having filed with the EEOC or state commission, to say nothing of those employees having received a right to sue letter. Still, counsel requested that I issue a preliminary injunction until the Employees "have an opportunity to file with the EEOC and the EEOC completes its investigation and/or issues every plaintiff a right to sue. . . ."[47]

This ask raises another question: can a court issue preliminary relief until an employee has had time to file?  The Third Circuit has not, to my knowledge, addressed this sue-first-file-later approach; nor have the parties put forward any caselaw directly on point. The parties have, however, put forward caselaw from other federal courts on the issue. The takeaway: it's a mixed bag.

The crux of the issue is this: Title VII authorizes the EEOC to request an injunction from a court after receiving the complaint.[48] Specifically, the statute provides that "[w]henever a charge is filed with the Commission and the Commission concludes . . . that prompt judicial action is necessary . . . the Commission . . . may bring an action for appropriate temporary or preliminary

---

[46]   42 U.S.C. § 2000e-5(f)(1).
[47]   Doc. 14 at 37, ¶ C.
[48]   *Id.*

relief . . . ."[49] Based on this power having been lodged with the EEOC, courts have reasoned that Congress didn't intend for courts to entertain pre-filing preliminary injunctions.[50] And indeed, this approach squares with Congress's desire to funnel these claims through agencies first. That approach was taken in part so that the agencies could ferreting out fraudulent and frivolous claims, and thus avoid overburdening the courts. (That the Employees suit, with its attendant legal deficiencies, has required that this Court expend some seven-thousand words is evidence on this front.)

Yet not all courts have taken this approach—and for good reason. As those courts have noted, our antidiscrimination laws plainly have a goal more important than judicial efficiency: preventing discrimination.[51] What's more, Congress never explicitly foreclosed pre-filing equitable relief in the statute. As the United States Court of Appeals for the District of Columbia Circuit noted in its opinion on the subject, "without an express contrary indication from Congress, federal courts have inherent equitable power to issue such injunctions to preserve the status quo."[52] Thus, in some jurisdictions, the "showing of irreparable harm may justify the

---

[49]   42 U.S.C. § 2000e-5(f)(2).

[50]   *See e.g. Bacon*, 2021 WL 5183059.

[51]   *Wagner*, 836 F.3d at 575 ("The overarching purpose of the 1972 amendments was to achieve the goal of effectively eradicting employment.").

[52]   *Id.* at 572.

granting of a preliminary injunction in a Title VII case even where plaintiffs did not obtain a right-to-sue letter."[53]

But even among courts that agree that preliminary relief is available under Title VII prior to filing, the approaches differ. For instance, in its opinion on the subject, the United State Court of Appeals for the First Circuit suggested that a heightened irreparable injury standard would be required: "to obtain such relief, a claimant would have to, at a minimum, make a showing of 'irreparable injury sufficient in kind and degree to justify the disruption of the prescribed administrative process.'"[54] At the same time, others, have considered it as a factors that "cut[s] against the likelihood of success on the merits . . . ."[55]

So where does that leave us? Given that the EEOC can seek preliminary relief upon the filing of a complaint, I am skeptical that an employee should be able to seek preliminary relief prior to filing. Doing so would allow for an end-run around the administrative process that Congress crafted. But in the end, this is nothing more than an interesting legal question.

That's because picking a side in this split is unnecessary: even if this Court were to import another circuit's standard allowing such actions, it's clear that the Geisinger Employees would fail. Far from meeting any heightened irreparable harm

---

[53]   2021 WL 5234394, at *19.
[54]   *Id.* (quoting *Bailey v. Delta Air Lines, Inc.*, 722 F.2d 942, 944–45 (1st Cir. 1983)).
[55]   *Beckerich v. St. Elizabeth Med. Ctr.*, 2021 WL 4398027 (E.D. Ky. Sept. 24, 2021).

standard, the Employees have not shown that they will suffer an irreparable harm at all.

The first of the Geisinger Employee's irreparable harm arguments is that they will lose their jobs. But Supreme Court has made clear that loss of employment, unless accompanied by a "genuinely extraordinary situation," won't do.[56] And while the Supreme Court has yet to describe what will do, in the case marking out this "genuinely extraordinary situation" rule, the Court refused to recognize humiliation, reputational harm, lost income, difficulty finding a new job, and loss of skills as sufficient.[57]

Their second argument is that they will lose their constitutional freedoms. I've made clear already that the Geisinger Employees do not have a federal or state constitutional right against their employer.

Accordingly, even if a preliminary injunction prior to the exhaustion of administrative remedies were authorized under the law of this circuit, this case would not warrant its use.

## 2. The Geisinger Employee's Sincere, Religious Belief

The Employees have not met the administrative exhaustion requirements, but even if they had, their claim would fail at the prima facie stage. To review, in a Title VII case, an employee must show "that (1) [they] held a sincere religious belief that

---

[56]  *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974).

[57]  *Id.* at 92 & n.68, 92. *See also Bedrossian v. Nw. Mem'l Hosp.*, 409 F.3d 840, 845 (7th Cir. 2005) (discussing *Sampson*).

conflicted with a job requirement, (2) [they] informed [their] employer of the conflict, and (3) [they are] going to be disciplined for failing to comply with the conflicting request."[58] Here, the second and third element are not at issue. The Employees sought an exemption from Geisinger; Geisinger rejected those requests; and their policy provides for termination should the Employees fail to get in line.[59] Geisinger contests, however, whether the Employees have shown that they have sincere religious objections to the policy.

Assessing whether a person's beliefs are religious is often a difficult, but necessary, step in a Title VII suit.[60] In the Third Circuit, courts look to the definition of religion set out in *Africa v. Commonwealth of Pennsylvania*:

> First, a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters. Second, a religion is comprehensive in nature; it consists of a belief-system as opposed to an isolated teaching. Third, a religion often can be recognized by the presence of certain formal and external signs.[61]

Here, this task is impossible because the Geisinger Employees provide no information whatsoever about their beliefs in their second amended complaint or their brief.[62] When pressed at oral argument, counsel vaguely asserted that some had Buddhist-like beliefs that their body was their temple, others objected on the grounds

---

[58]   *Id.*
[59]   Doc. 14 at ¶ 155.
[60]   *Fallon*, 877 F.3d at 490–91.
[61]   662 F.2d 1025 (3d Cir. 1981)
[62]   *See generally* Doc. 14 & Doc. 18.

that the test violated the Nuremberg Code, and more, still, thought that it violated a precept of their Christian faith—that they were made in the image of God.

For one, these vague assertions still would not give this Court enough to go on under *Africa*—to say nothing of the problems that would result from allowing a few employees belief to serve as the basis for class-wide relief.

But setting those issues aside, what the Employees have provided to the Court suggests that their religious objections are neither rooted in religion, nor truly objections. The Employees requested relief is at war with itself: it is particularly difficult, if not impossible, to square the Employees alternate requested relief—that I require all employees to be tested—with their supposedly deeply felt religious opposition to testing. If you are willing to be tested so long as the vaccinated are too, you are not religiously opposed to testing. On a separate note, the Employees' hyper-focus on the "science" of testing and its potentially harmful health effects in their papers only furthers this Court's skepticism that what objection they might have is rooted in a scientific or medical belief, not religion.[63]

Far from carrying their burden, the Employees pleadings and briefing fail to detail how their opposition to Geisinger's policy is rooted in a religious belief. Their papers utterly fail to address the matter.

---

[63]     Doc. 40 at ¶¶ 126–151.

### 3.   Providing an Additional Exemption's Undue Hardship on Geisinger

Given that the Employees have neither exhausted their administrative remedies nor shown that their objection is based on a sincere religious belief, Geisinger need not show that providing an exemption would impose an undue hardship. But for the sake of completeness, I'll note that they have carried their burden.

As I noted above, the "undue hardship" requirement originates in the text of Title VII. The Act proscribes religious discrimination and goes on to define "religion" to "include[] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonable accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." At this stage, the focus turn to the second clause—the undue hardship. The Supreme Court and Third Circuit have established the following parameters: "An accommodation constitutes an 'undue hardship' if it would impose more than a de minimis cost on the employer."[64]

Geisinger has shown here that it would be more than a de minimis cost for them to harbor employees that are both unvaccinated and untested. Their principal argument is that an unvaccinated individual is likelier than a vaccinated individual

---

[64]   *Webb,* 562 F.3d at 259–60 (citing *Hardison*, 432 U.S. at 84).

to be the source of an infection.[65] And, after consideration by their own experts and the advice of the CDC and EEOC, they concluded that testing was the best and least invasive way to reduce the risk that unvaccinated individuals pose to patients and staff.[66]

This approach stands up to both attacks that the Employees levy against it. The first—that PCR and Antigen COVID-19 tests cause cancer and are wholly ineffective at identifying when a person is infected—is not worthy of a response. As the English philosopher George Horne wrote, "Pertness and ignorance may ask a question in three lines, which it will cost learning and ingenuity thirty pages to answer."[67] We simply haven't the time to explore the depths of this statement's inaccuracy.

Their second attack—that because infected vaccinated and unvaccinated individuals transmit the virus at similar rates, employees should be tested regardless of vaccination status—warrants a response.

To support their claim, the Geisinger Employees repeatedly point to a study published by The Lancet reflecting this finding. But I'd be remiss to dive into this article without a few words of caution. Relying on any one study is bad process, even when that study is published by a reputable journal. Over the past decade, the medical sciences (among others) have struggled through a replication crisis—

---

[65]   Doc. 15 at 20–21.
[66]   *Id.*
[67]   George Horne, *Letters on Infidelity* (1786).

essentially, that the results of studies are not reproducible, making them unreliable. The causes are multiple—some honest, and some not—but researchers have developed tools to reduce the risk of error. That doesn't mean we can't trust science; it means that we can't just take any single study off the shelf that supports our view and assume its findings will hold.

For courts, this state of affairs emphasizes the need for experts—scientists who can situate studies in their broader context and comment on whether observational studies are backed by our understanding of biological, chemical, and physical processes; and scientists who can discuss the study's methodology and opine on their reliability. This is all to say that it would be a profound error for this Court—or any other—to commandeer a hospital system's COVID-19 program based on a single study.

But with those caveats aside, I'll still note that in my reading, this article in The Lancet still backs Geisinger's approach. In the "Interpretation" section, the authors of the study wrote the following: "Vaccination reduces the risk of delta variant infection and accelerates viral clearance. Nonetheless, fully vaccinated individuals with breakthrough infections have peak viral load similar to unvaccinated cases and can efficiently transmit infection in household settings, including to fully vaccinated contacts. . . ."[68]

---

[68]   Anika Singanayagam, et al., *Community transmission and viral load kinetics of the SARS-CoV-2 delta (B.1.617.2) variant in vaccinated an unvaccinated individuals in the UK: a*

The Employees have seized on the second half—repeatedly arguing that it's discriminatory to require that unvaccinated individuals be tested when vaccinated individuals that catch COVID-19 are as likely to infect as unvaccinated individuals who catch it. That's a half-truth.

While vaccinated individuals that catch COVID-19 may be as likely to infect others, they are significantly less likely to be infected in the first place—as the authors emphasized in their opening sentence: "Vaccination reduces the risk of delta variant infection . . . ." A recent CDC study estimated that vaccinated individuals are three-times less likely to be infected.[69] And both the CDC and The Lancet studies suggest that this number could be increased through an immunity enhancing booster shot.

But for our purposes, its entirely rational for Geisinger to have chosen to test employees whose risk of being a vector they cannot reduce through vaccination. It would impose more than a de minimis burden on Geisinger to exempt these employees, who are far more likely to be a vector, from the testing requirement.

And the same can be said for the Employees' other, contradictory request— that all employees be tested. It may be wise for Geisinger to test all employees.

---

*prospective, longitudinal, cohort study*, The Lancet (Oct. 29 2021), https://www.thelancet.com/journals/laninf/article/PIIS1473-3099(21)00648-4/fulltext.

[69]  Allison L. Naleway, et al., *Incidence of SARS-CoV-2 Infection, Emergency Department Visits, and Hospitalizations Because of COVID-19 Among Persons Aged ≥12 Years, by COVID-19 Vaccination Status — Oregon and Washington, July 4–September 25, 2021*, CDC.gov (Nov. 19, 2021) https://www.cdc.gov/mmwr/volumes/70/wr/mm7046a4.htm.

Indeed, the rough math suggests if vaccinated employees are three times less likely to be infected but outnumber unvaccinated staff 23,000 to 1,000, you might expect the bulk of infections—and thus transmission—to come from vaccinated employees. (Though that doesn't take into account other protective measures—such as masking—make reduce the risk of transmission while on the job; and the fact remains that any single unvaccinated employee is a greater danger than their vaccinated counterpart.) But, as a matter of law (not back of the envelope math) this "exemption"—which isn't an exemption because it would merely expand the objected to program by 23,000 individuals—would undoubtedly impose more than a de minimis cost on Geisinger.

### C.    Pennsylvania Human Relations Act Claims

Finally, I consider Geisinger's analogous discrimination claim—this time made under state, rather than federal law.

In Count I alleging religious discrimination, the Geisinger Employees invoke the Pennsylvania Human Relations Act. The Act, as codified at 43 P.S. § 955(a), prohibits employers from firing an employee because of their "religious creed."[70] And it further provides employees that are discriminated against "[a] right to a remedy . . . ."[71] This right can be found in section 953: "The opportunity for an

---

[70]    The section specifically provides that it is unlawful "[f]or any employer because of the . . . religious creed . . . of any individual . . . to discharge from employment . . . or to otherwise discriminate against such individual . . . with respect to compensation, hire, tenure, terms, conditions, or privileges of employment . . . ." 43 P.S. § 955(a).

[71]    43 P.S. § 953.

individual to obtain employment for which he is qualified . . . without discrimination because of . . . religious creed . . . is hereby recognized as and declared to be a civil right which shall be enforceable as set forth in this act."[72] But the statute's plain language—and its subsequent interpretation by the Pennsylvania Supreme Court—emphasize, the Act "both bestows a right to be free from discrimination based on [religious creed] and prescribes procedures whereby the right 'shall' be vindicated."[73]

The prescribed procedures at play here are found in section 962, which details the process that must be followed before a claim can be filed in court.[74] This section opens by providing that employees' right to seek a remedy in court "shall not be foreclosed."[75] But as the Pennsylvania Supreme Court has noted, this section provides a "final, rather than initial, resort to courts."[76] That's because section 962(c)(1) further provides that the Pennsylvania Human Relations Commission has "exclusive jurisdiction of a complaint alleging violations under the [Pennsylvania Human Relations Act] for a period of one year . . . ."[77]

---

[72]  *Id.*

[73]  *Clay v. Advanced Comput. Applications, Inc.*, 559 A.2d 917, 919 (Pa. 1989). The plain, operative statutory language is that the civil right "shall be enforceable as set forth in this act." 43 P.S. § 953.

[74]  43 P.S. § 962(c)(1).

[75]  *Id.*

[76]  *Clay*, 559 A.2d at 920.

[77]  *Id.* (quoting *Lukus v. Westinghouse Elec. Corp.*, 419 A.2d 431, 455 (Pa. Super. 1990)).

So for this Court to even entertain a claim under this statute, the Geisinger Employees must have lodged a complaint with the Pennsylvania Human Relations Commission and given them at least one year to act on the complaint.[78] Those conditions have not been met. The Geisinger Employees have given no indication that they have filed a complaint; nor have they pointed to a Commission action or the passage of a year without any action that would allow them to file a claim in court.

Like its federal counterpart, the Pennsylvania statute similarly gives the Commission the power to seek a preliminary injunction. 43 P.S. § 959.2 provides:

> If the Commission concludes, at any time following the filing of a complaint under this act, that prompt judicial action is necessary to prevent immediate and irreparable harm, the Commission may commence an action in Commonwealth Court or the appropriate court of common pleas, and that court may grant an appropriate preliminary or special injunction pending final disposition of the complaint.[79]

The parties have not briefed this issue, but barring precedent from other Pennsylvania courts to the contrary, this arguably leaves the Court with the same file-first-sue-later dilemma. But just the same, its an unnecessary question to answer.

---

[78]   43 P.S. § 962(c)(1) ("If within one (1) year after the filing of a complaint with the Commission, the Commission dismisses the complaint or has not entered into a conciliation agreement to which the complainant is a party, the Commission must so notify the complainant. On receipt of such a notice the complainant shall be able to bring an action in the courts of common pleas of the Commonwealth based on the right to freedom from discrimination granted by this act.").

[79]   43 P.S. § 959.2.

For one, as I noted earlier, there is no irreparable harm. Second, even if this Pennsylvania law claim was properly before this Court and there was an irreparable harm, it would fail on the substance for the same reason that the Employees' Title VII claim failed on the substance.

Title VII and the PHRA provide the same protections "'except where there is something specifically different in the language' justifying the construction."[80] "'Religious Creed' is not defined within the text of the [Pennsylvania Human Relations Act]."[81] And, in keeping with Pennsylvania federal and state courts interpretation, I "construe the term 'religious creed' . . . [under] the [Pennsylvania Human Relations Act] to have the same meaning as the term 'religion' . . . [under] Title VII."[82]

Just as the Geisinger Employees' failure to provide any information whatsoever about their religious belief prevents them from showing that they have a sincere religious belief dooms their Title VII claim, this failure would also doom their Pennsylvania Human Relations Act claim.

---

[80]  *Prise v. Alderwoods Grp. Inc.*, 657 F. Supp. 2d 564, 586 (W.D. Pa. 2009) (quoting *Fogleman v. Mercy Hosp. Inc.*, 283 F.3d 561, 567 (3d Cir. 2002)).

[81]  *Id.*

[82]  *Id.*; *Pennsylvania State Univ. v. Pa. Hum. Rels. Comm'n*, 505 A.2d 1053 (Pa. Cmwlth. 1986) (noting the "Pennsylvania Supreme Court's favorable view of the United States Supreme Court's interpretation of the federal analogue to the Pennsylvania statute, and the commission's own adoption of the federal law's definition of 'religion'" in overturning a lower court decision not to use "the de minimis standard applied by the United States Supreme Court in *Trans World Airline*" in a Pennsylvania Human Relations Act case).

The Geisinger Employees are, in sum, unable to show a likelihood of success on the merits of their Title VII claim or an attendant irreparable harm. A preliminary injunction based on these claims is therefore unwarranted.

## IV.   CONCLUSION

Federal courts are empowered to redress unlawful conduct—not conduct which parties merely perceive as unfair or incorrect. And here, the Geisinger Employees have not shown that they are entitled to relief as a matter of law. Their request for a preliminary injunction is denied.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge