## STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHRISTINE LYNN FINKBEINER, individually and on behalf of all others similarly situated employees, | : : : | Civil Case No. 4:21-01903-MWB |
| | : | **CLASS ACTION THIRD** |
| PLAINTIFFS, | : : | **AMENDED COMPLAINT** |
| | : | **JURY TRIAL DEMANDED** |
| v. | : : | |
| GEISINGER SYSTEM SERVICES, a Pennsylvania non-profit corporation, and any other similarly situated defendant affiliated with GEISINGER CLINIC, GEISINGER MEDICAL CENTER, and GEISINGER HEALTH PLAN, | : : : : : : : : | |
| DEFENDANTS. | : | |

## <u>THIRD AMENDED COMPLAINT</u>

Plaintiff, Christine Lynn Finkbeiner ("Finkbeiner"), by and through her undersigned counsel, Gregory A. Stapp, Esquire, hereby files this Third Amended Complaint as a representative plaintiff for all similarly situated employees against defendants Geisinger Clinic ("GC"), Geisinger Medical Center ("GMC"), Geisinger Health Plan ("GHP"), Geisinger Lewistown Hospital ("GLH"), Geisinger Wyoming Valley Medical Center ("GWV"), Geisinger System Services ("GSS") Geisinger Bloomsburg Hospital ("GBH"), Geisinger Community Medical Center ("GCMC"), Geisinger Potsville Cancer Center ("GPCC"), Geisinger Hazelton Cancer Center ("GHCC"), Geisinger Mail Order Pharmacy ("GMOP"), West Shore Advanced Life

Support Services, Inc. ("WSALSS"), and Geisinger System Financial Edits ("GSFE") ("Defendants").  In support of the claims set forth herein, Finkbeiner alleges and avers as follows:

## I.    SUMMARY OF THE ACTION

1.    Without any official mandate from the federal or state government, Geisinger mandated that its employees be subjected to an EUA approved only "vaccine" by September 10, 2021 or file a religious or medical exemption, whether treating patients and working at one of their facilities or working from home, or they would lose their jobs in violation of the Nuremberg Code, federal law, and the Constitution of the United States.  After many employees were granted religious exemptions from the EUA approved only "vaccines", the defendants provided a "conditional approval" that required any employee who was granted a religious exemption to swab their nasal passage twice a week with EUA approved only PCR or Antigen tests and with swabs that contained ethylene oxide.  The defendants enforced these mandates regardless of the sincerely held religious convictions of Plaintiff and other similarly situated employees.  The Plaintiff  and other similarly situated employees seek damages in their prayer for relief.

## II.    JURISDICTION AND VENUE

2.    Plaintiffs incorporate the foregoing paragraphs as is set forth in full herein. This Court has subject matter jurisdiction over Plaintiffs' claims under 28

U.S.C. §1331, 28 U.S.C. §§1343(a)(3), (4), and 42 U.S.C. §1983.

3.      There exists an actual and justiciable controversy between Plaintiffs and Defendants requiring resolution by this Court.

4.      Plaintiffs have no adequate remedy at law.

5.      Venue is proper before the United States District Court for the Middle District of Pennsylvania under 28 U.S.C. §1391 because all parties reside or otherwise are found herein, and all acts and omissions giving rise to Plaintiffs' claims occurred in the Middle District of Pennsylvania.

## III.   THE PARTIES

6.      Plaintiff Christine Lynn Finkbeiner is a U.S. citizen and resident of the Commonwealth of Pennsylvania.  Ms. Finkbeiner has worked at GSS for 16 years.

7.      Pursuant to Federal Rule of Civil Procedure 23, Finkbeiner is a representative plaintiff for all similarly situated employees, whether still employed or not, of GSS or any and all affiliates of Geisinger Clinic, Geisinger Medical Center, or Geisinger Health Plan, who have suffered as a result of the vaccine mandate or the conditional approval requiring the swabbing of their nasal passage twice a week.

8.      Defendant, Geisinger  System Services, is a non-profit corporation and subsidiary of Geisinger Clinic and/or Geisinger Medical Center and/or Geisinger Health Plan, duly organized under the laws of the Commonwealth of Pennsylvania and is engaged in the business of providing health care and services to the public,

3

maintaining one of its places of business in Danville, Pennsylvania.

9.     Defendant, Geisinger System Services is a representative defendant for any and all affiliates of Geisinger Clinic, Geisinger Medical Center or Geisinger Health Plan for which Finkbeiner and any other similarly situated employee may have worked.

## IV.   FACTUAL ALLEGATIONS

10.     Finkbeiner worked for Defendant, GSS, for sixteen (16) years.  During the last approximately two years of her employment with GSS she worked entirely from home.  Finkbeiner is a 53-year-old single female who was discharged on December 3, 2021, as a result of Geisinger stating that she refused to follow the conditional approval policy which required her to use a nasal swab that contained ethylene oxide twice a week.

11.     Finkbeiner, along with other similarly situated employees became anxious in 2021 as a result of the "writing on the wall" that Geisinger was going to implement some type of vaccine mandate.

12.     The Defendants did issue a vaccine mandate for all their employees on or about August 31, 2021, advising the employees that they must submit their religious or medical exemptions by September 10, 2021.

13.     Finkbeiner requested a Religious Exemption for the EUA approved only "vaccine" mandate in September 2021. (See Finkbeiner's Affidavit with her

religious exemptions to the EUA approved "vaccines" and the PCR antigen test attached hereto as **Exhibit A**.)  Finkbeiner received an email from her employer, as did similarly situated employees whose religious exemptions were granted to the EUA-only approved "vaccines" by an email that indicated that the approval was "conditional".

14.   Weeks after the conditional approval, Finkbeiner and other similarly situated employees were advised that in order to continue their employment with the Defendants they would be required to submit to either a PCR test or Antigen test twice weekly and that they would be required to quarantine for fourteen (14) days if they were exposed to an individual who tested positive for COVID-19.  They were also advised that if they were required to quarantine, they would not receive paid time off, unlike the vaccinated employees.  Following the filing of the original Complaint in this matter, the Defendants have now modified the PTO policy to pay for time off to unvaccinated employees who are required to quarantine for fourteen (14) days as well.

15.   In Geisinger's own email to Finkbeiner and other similarly situated employees they state that only employees that have received the religious or medical exemption will be required to participate in testing twice weekly and be required to quarantine for fourteen (14) days if they are exposed to an individual with COVID-19.

16.     Finkbeiner and other similarly situated employees were advised by the Defendants that each day that they failed to submit to a PCR or Antigen test or the Cue Health, Inc. test it will be considered as a declination of the accommodations offered and that they will be considered to have voluntarily resigned from their employment with Geisinger.

17.     The first date that Plaintiff and other similarly situated employees were required to submit to a PCR or Antigen test or the Cue Health, Inc. test was November 9, 2021.

18.     If the employees failed to submit to three tests on November 9, 2021, November 11, 2021, and November 16, 2021, they would be fired on or about November 16, 2021.

19.     When Finkbeiner and other similarly situated employees received the conditional approval email, they requested a religious exemption from the requirement to test twice weekly as enumerated in her Affidavit.  Finkbeiner's religious exemption request, as all other similarly situated employees, was denied by the above-captioned Defendants.

20.     Following the denial of the religious exemption to the PCR tests, Finkbeiner was fired on December 3, 2021.  Finkbeiner and other similarly situated employees have continued to suffer wage loss, loss of health insurance and benefits, and emotional distress since their discharge.  Finkbeiner, as other similarly situated

employees, applied for unemployment compensation benefits.  Finkbeiner had to wait for several months until she received a decision on or about April 20, 2022, indicating that her benefits were being approved.

21.     Finkbeiner and other similarly situated employees have filed complaints before the Pennsylvania Human Relations Commission and the Equal Employment Opportunity Commission regarding the violations of their rights which are currently pending.

22.     It is the purpose of this complaint to bring Ms. Finkbeiner's claims before this Honorable Court with the understanding that the Defendants will waive any defense related to the exhaustion of her administrative remedies.

23.     The tests that were mandated by the Defendants were the Quidel At-Home test kit and the Cue Health, Inc. test. (See the Quidel At-Home test kit information packet and the Quick Vue SARS Antigen test information attached hereto at **Exhibit B**). (The Cue Health, Inc. information is attached hereto at **Exhibit B-1**).

24.     Both the Quidel Quick Vue test and the Cue Health, Inc. test state that they have been approved by the Food and Drug Administration for Emergency Use Authorization only.

25.     As such, both tests fall under 21 U.S.C. §360bbb-3 which states that individuals are allowed to accept or reject the EUA approved only medical product

or device. See 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III).

26.     The Quick Vue SARS Antigen test states in the "Limitations" portion of its handout the following:

  a.  "Positive test results do not rule out co-infections with other pathogens."

  b.  "If the differentiation of specific SARS viruses and strains is needed, additional testing, in consultation with state or local public health departments, is required;"

  c.  "Performance at the time of testing may vary depending on the variants circulating, including newly emerging strains of SARS-CoV-2 and their prevalence, which change over time;" and, most importantly

  d.  "**The performance of this test has not yet been clinically validated for use in patients without signs and symptoms of respiratory infection, or for serial screening applications and performance may differ in these populations.**"

27.     The Quidel At-Home COVID-19 Test states that testing should be performed in an area with adequate ventilation.  It also states, "The Reagent Solution contains harmful chemicals (see table below).  If the solution contacts the skin or eye, flush with copious amounts of water.  If irritation persists, seek medical advice:

https://www.poison.org/contact -us or 1-800-222-1222."

28.    The Quidel At-Home test kit utilizes nasal swabs made by Puritan.  The instructions state, "Do not touch swab tip when handling the swab."  Those nasal swabs contain Ethylene Oxide according to the information obtained by one of the plaintiffs from Puritan directly. (See the Puritan Information at **Exhibit B**).

29.    Puritan, the company that manufactures the nasal swabs for the tests being provided by the Defendants to comply with the policy, published a Memorandum entitled, "RE: Concerns Regarding Ethylene Oxide as a Method of Sterilization."  In the memorandum, Puritan states, "Ethylene Oxide does possess mutagenic properties and is classified as a human carcinogen by the International Agency for Research on Cancer.  Ethylene Oxide may also form Ethylene Chlorohydrin, which is **toxic.**"

30.    According to the National Cancer Institute, Ethylene Oxide has the ability to damage DNA making it an effective sterilizing agent but also accounts for its cancer-causing activity.

31.    The National Cancer Institute handout on Ethylene Oxide states, "The primary routes of human exposure to ethylene oxide are inhalation and ingestion, which may occur through occupational, consumer, or environment exposure. Because ethylene oxide is highly explosive and reactive, the equipment used for its processing generally consists of tightly closed and highly automated systems, which

decreases the risk of occupation exposure." (See the handout attached at **Exhibit C**). In the present case, the Defendants are asking the Plaintiffs to voluntarily place this chemical up their nose twice a week even though it is described as a carcinogen and "toxic."

32.     According to the National Toxicology Program at the Department of Health and Human Services, "An increased risk of cancer has been demonstrated in epidemiological studies of workers using ethylene oxide as a sterilant for medical devices and spices and in chemical synthesis and production."  (See the handout attached at **Exhibit D**).

33.     The DHHS statement on ethylene oxide goes on to state, "Exposure by dermal contact is _expected_ to be low under most circumstances."  Yet, in the present case the Defendants are requiring the Plaintiffs to subject themselves not just to dermal contact twice a week but contact inside their nasal passage.

34.     It should be noted that on July 21, 2021, the CDC issued a memorandum withdrawing its recommendation for its approval for PCR antigen tests, out of which the Quidel test is. (See the CDC Memorandum attached hereto at **Exhibit E**).

35.     Despite this memorandum from the CDC, Geisinger proceeded to issue the conditional approval email in October 2021 requiring employees to use a PCR antigen test.

36.     Plaintiff believes and therefore avers that Geisinger was working with the federal government in implementing the EUA approved only "vaccine" mandate to their employees.

37.     Plaintiff believes and therefore avers that Geisinger worked with the federal government and/or state government to force their employees to subject themselves to the EUA approved only "vaccines."

38.     Plaintiff believes and therefore avers that the discovery will show evidence of Geisinger working with the federal government to force employees to be subjected to one of the EUA approved only "vaccines."

39.     In September of 2021, or around the time the Defendants implemented their "vaccine" mandate for all their employees, the CDC changed the definition of the word "vaccine" on its website.

40.     The definition was, "**Vaccine:** A product that produces immunity therefore protecting the body from the disease. Vaccines are administered through needle injections, by mouth and by aerosol." https://archive.ph/3K81G#selection-611.0-613.163.

41.     On or around September 2021, the CDC changed the definition on their webpage to:

a.   "**Vaccine:** A preparation that is used to stimulate the body's immune response against diseases. Vaccines are usually administered

through needle injections, but some can be administered by mouth or sprayed into the nose.

b. **Vaccination:** The act of introducing a vaccine into the body to produce protection from a specific disease." https://www.cdc.gov/vaccines/vac-gen/imz-basics.htm.

42.     The Defendants received over $120,000,000 from various federal and state governments.  (Please see attached documentation that Plaintiffs have obtained indicating the amounts paid to the Defendants related to the COVID-19 pandemic attached hereto at **Exhibit F**).

43.     Geisinger admits in their own correspondence to the Plaintiffs that only those who requested religious or medical exemptions would be required to perform the PCR test twice weekly and to be quarantined in a manner differently than those who were vaccinated.  Therefore, by Geisinger's own admission, they are treating employees that were granted religious or medical exemptions to the vaccine mandate differently than those who were vaccinated.

44.     Geisinger's argument for this treatment is that it is a reasonable accommodation to the exemption request to the EUA approved only "vaccines" to ask that Plaintiffs be tested twice weekly with a PCR or Antigen test.  However, the science is now clear and demonstrates that individuals with COVID-19 vaccinations are just as likely, if not more so, to spread COVID-19 among staff, visitors, and

patients.

45.     The science is also clear that the PCR tests and/or Antigen tests are not effective in determining whether a person has COVID-19.

46.     If the PCR tests are not effective in determining COVID-19, there can be no purpose to this exercise other than to discriminate against those who requested a religious exemption to the "vaccine" itself by requiring them to **shove a swab containing a carcinogen up their nose twice a week.**

47.     The fact that the PCR tests or Antigen tests are both ineffective at detecting the presence of COVID-19 simply establishes the fact for trial that the Defendants request to submit to testing twice weekly as an accommodation is not reasonable, but rather punishment for failing to submit to an EUA approved only "vaccine."

48.     The Defendant has also implemented a policy for their employees if they are exposed to COVID-19, even if they don't have any symptoms.  If you are vaccinated when you are exposed to COVID-19, you may report to work as normal. If you are unvaccinated, you receive an automatic 14-day quarantine.

**A.  PCR Tests Are Not Effective in Detecting The SARS-COV-2 Virus**

49.     DHHS authorized the emergency use of the polymerase chain reaction ("PCR") test as a diagnostic tool for COVID-19, with disastrous consequences. The PCR tests are themselves experimental products, authorized by the FDA under

separate EUAs. PCR test manufacturers use disclaimers like this in their product manuals: "[t]he FDA has not determined that the test is safe or effective for the detection of SARS-Co-V-2." Manufacturer inserts furnished with PCR test products include disclaimers stating that the PCR tests should NOT be used to diagnose COVID-19. This is consistent with the warning issued by the Nobel Prize winning inventor of the PCR test that such tests are not appropriate for diagnosing disease.

50.     In an article entitled, "*Has Provincetown Become Protease Town,*" New York Native, by John Lauritsen, December 9, 1996, Kary Mullis, the inventor who won a Nobel Prize in Science for inventing the PCR test discussed the test itself. With regard to the viral load tests, which attempt to use PCR for counting viruses, Mullis has stated:  "Quantitative PCR is an oxymoron." PCR is intended to identify substances qualitatively, but by its very nature is unsuited for estimating numbers. Although there is a common misimpression that the viral load tests actually count the number of viruses in the blood, **these tests cannot detect free, infectious viruses at all**; they can only detect proteins that are believed, in some cases wrongly, to be unique to HIV. **The tests can detect genetic sequences of viruses, but not viruses themselves."**

51.     The way in which the PCR tests are administered guaranties an unacceptably high number of false positive results. Cycle Threshold Value ("CT value") is essentially the number of times that a sample (usually from a nasal swab)

is magnified or amplified before a fragment of viral RNA is detected. The CT Value is exponential, and so a 40-cycle threshold means that the sample is magnified around a trillion times. The higher the CT Value, the less likely the detected fragment of viral RNA is intact, alive, and infectious.[1]

52.     Virtually all scientists, including Dr. Fauci, agree that any PCR test run at a CT value of 35-cycles or greater is useless. Dr. Fauci has stated (emphasis below added):

> What is now evolving into a bit of a standard is that if you get a cycle threshold of 35 or more that the chances of it being replication competent are miniscule… We have patients, and it is very frustrating for the patients as well as for the physicians... somebody comes in and they repeat their PCR and it's like 37 cycle threshold... you can almost never culture virus from a 37 threshold cycle. So, I think if somebody does come in with 37, 38, even 36, you gotta say, you know, it's dead nucleotides, period. In other words, it is not a COVID-19 infection.[2]

53.     A study funded by the French government showed that even at 35-cycles, the false positivity rate is as high as 97%.  Despite this, a majority of the PCR tests for COVID-19 deployed under EUAs in the United States are run at 35-45 cycles in accordance with manufacturer instructions. Under the EUAs issued by the FDA, there is no flexibility to depart from the manufacturer's instructions and

---

[1]   https://www.oralhealthgroup.com/features/the-problems-with-the-covid-19-test-a-necessary-understanding/   (last visited July 15,2001).

[2]   https://1027kearneymo.com/kpgz-news/2020/11/9/covid-tests-may-inflate-numbers-by-picking-up-dead-virus (last visited July 15, 2021)

change the way in which the test is administered or interpreted. The chart below shows that all major PCR tests in use in the United States are run at cycles of up to 35 or higher.

| Manufacturer | Manufacturer's Recommended Cycle Threshold |
|---|---|
| Xiamen Zeesan SARS-CoV-2 Test Kit (Real-time PCR) | 45 cycles |
| Opti Sars CoV-2 RT-PCR Test | 45 cycles |
| Quest SARS-CoV-2rRT-PCR Test | 40 cycles |
| CDC 2019-Novel Coronavirus Real Time (RT-PCR Diagnostic Panel) Test | 40 cycles |
| Wren Labs COVID-19 PCR Test | 38 cycles |
| LabCorp COVID-19 RT-PCR Test | 35 cycles |

54.    Further, the Defendants and their counterparts in state governments used the specter of "asymptomatic spread" — the notion that fundamentally healthy people could cause COVID-19 in others — to justify the purported emergency. But there is no credible scientific evidence that demonstrates that the phenomenon of "asymptomatic spread" is real. On the contrary, on June 7, 2020, Dr. Maria Von Kerkhov, head of the WHO's Emerging Diseases and Zoonosis Unit, told a press conference that from the known research, asymptomatic spread was "very rare." "From the data we have, it still seems to be rare that an asymptomatic person actually transmits onward to a secondary individual." She added for emphasis: "it's very rare."

55.    Researchers from Southern Medical University in Guangzhou, China,

16

published a study in August 2020 concluding that asymptomatic transmission of COVID-19 is almost non-existent. "Asymptomatic cases were least likely to infect their close contacts," the researchers found. A more recent study involving nearly 10 million residents of Wuhan, China found that there were no — zero — positive COVID-19 tests amongst 1,174 *close contacts* of asymptomatic cases, *indicating the complete absence of asymptomatic transmission.*

56.     On September 9, 2020, Dr. Fauci was forced to admit in an official press conference:

> [E]ven if there is some asymptomatic transmission, in all the history of *respiratory borne viruses of any type, asymptomatic transmission has never been the driver of outbreaks. The driver of outbreaks is always a symptomatic person, even if there is a rare asymptomatic person that might transmit, an epidemic is not driven by asymptomatic carriers.*[3]

57.     The current information from the Lancet, as well as other medical periodicals, clearly shows that the "vaccines" are neither safe or effective. The Lancet published correspondence entitled, "Transmissibility of SARS-CoV-2 among fully vaccinated individuals" on January 1, 2022, which stated "A prospective cohort study in the UK by Anika Singanayagam and colleagues [2] regarding community transmission of SARS-CoV-2 among unvaccinated and

---

[2]   https://1027kearneymo.com/kpgz-news/2020/11/9/covid-tests-may-inflate-numbers-by-picking-up-dead-virus   (last visited July 15, 2021)

[3]   https://www.statnews.com/2021/01/23/asymptomatic-infection-blunder-covid-19-spin-out-of-control   (last visited July 15, 2021).

vaccinated individuals provides important information that needs to be considered in reassessing vaccination policies. This study showed that the impact of vaccination on community transmission of circulating variants of SARS-CoV-2 appeared to be not significantly different from the impact among unvaccinated people.[2] [3] The scientific rationale for mandatory vaccination in the USA relies on the premise that vaccination prevents transmission to others, resulting in a "pandemic of the unvaccinated". [4] Yet, the demonstration of COVID-19 breakthrough infections among fully vaccinated health-care workers (HCW) in Israel, who in turn may transmit this infection to their patients, [5] requires a reassessment of compulsory vaccination policies leading to the job dismissal of unvaccinated HCW in the USA. Indeed, there is growing evidence that peak viral titres in the upper airways of the lungs and culturable virus are similar in vaccinated and unvaccinated individuals.[2,3,5-7]….. Thus, the current evidence suggests that current mandatory vaccination policies might need to be reconsidered, and that vaccination status

---

[2] https://1027kearneymo.com/kpgz-news/2020/11/9/covid-tests-may-inflate-numbers-by-picking-up-dead-virus (last visited July 15, 2021)

[3] Wilder Smith A What is the vaccine effect on reducing transmission in the context of the SARS-CoV-2 delta variant? *Lancet Infect Dis.* 2021; (published online Oct 29.)

[4] Tayag Y Stop calling it a pandemic of the unvaccinated. The Atlantic. https://www.theatlantic.com/ideas/archive/2021/09/persuade-unvaccinated-protect-unvaccinated/620091/ Date: Sept 21, 2021

[5] Bergwerk M Gonen T Lustig Y et al. COVID-19 breakthrough infections in vaccinated health care workers. *N Engl J Med.* 2021; 385: 1474-1484

[6] Hagan LM McCormick DW Lee C et al. Outbreak of SARS-CoV-2 B.1.617.2 (delta) variant infections among incarcerated persons in a federal prison—Texas, July–August 2021. *MMWR Morb Mortal Wkly Rep.* 2021; 70: 1349-1354

[7] Acharya CB Schrom J Mitchell AM et al. No significant difference in viral load between vaccinated and unvaccinated, asymptomatic and symptomatic groups infected with SARS-CoV-2 delta variant. *medRvix.* 2021; (pub online Sept 29.) (preprint).

should not replace mitigation practices such as mask wearing, physical distancing, and contact-tracing investigations, even within highly vaccinated populations.

## COUNT I
**Plaintiff, Christine Lynn Finkbeiner, et al. v. All Defendants**
**RELIGIOUS DISCRIMINATION**

58.     Paragraphs 1 through 57 are hereby incorporated by reference as though the same were fully set at length herein.

59.     Title VII prohibits "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Xiaoyan Tang v. Citizens Bank, N.A.*, 821 F.3d 206, 215 (1st Cir. 2016) quoting from 42 U.S.C. § 2000e–2(a)(1).

60.     Art. I § 3 of the Pennsylvania Constitution, "All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; no man can of right be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent; no human authority can, in any case whatever, control or interfere with the rights of conscience, and no preference shall ever be given by law to any religious establishments or modes of worship." 43 P.S. §955(5)(f) states, "It shall be unlawful discriminatory practice…For any employment agency to fail or refuse to classify properly, refer for employment or otherwise to discriminate against any individual because of his race,

color, religious creed, ancestry, age, sex, national origin, non-job related handicap or disability or the use of a guide or support animal because of the blindness, deafness or physical handicap of the user."

61.  Defendant had a duty to "[O]ffer a reasonable accommodation to resolve a conflict between an employee's sincerely held religious belief and a condition of employment, unless such an accommodation would create an undue hardship for the employer's business." *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 133 (1st Cir. 2004).

62.  Once an employee demonstrates that their religious belief conflicts with an employment condition, "the burden then shifts to the employer to show that it offered a reasonable accommodation or, if it did not offer an accommodation, that doing so would have resulted in undue hardship." *Id.*

63.  Finkbeiner and other similarly situated employees requesting religious accommodations submitted a request for religious accommodation to the defendant's conditional approval policy requiring unvaccinated employees to submit to a PCR or Antigen test twice weekly, informing defendant that its policy was in conflict with their sincerely held religious beliefs.

64.  Defendants neither offered to accommodate the plaintiffs nor showed that an accommodation would have resulted in "undue hardship."

65.  Despite failing to assert an undue hardship, defendant in fact would not

be "unduly burdened" or face hardship in accommodating plaintiffs' requests, not only because it would not financially or operationally burden defendant to accommodate plaintiffs, but because the PCR or Antigen tests are not effective in determining whether an individual is infected with COVID-19.

66.     Defendant also failed to engage in any meaningful discussion, interactive process or appeal with the plaintiffs who requested reasonable accommodations.

67.     Finkbeiner and other similarly situated employees were and are ready, willing, and able to abide by any reasonable accommodations to defendant's policy.

68.     Finkbeiner and other similarly situated employees were terminated due to their inability to adhere to the defendant's policy because of their religious beliefs.

WHEREFORE, Plaintiffs demand judgment against Defendants for lost pay and benefits, lost future pay and benefits, compensatory damages, punitive damages, nominal damages, attorney's fees and costs, interest, and all other relief which this Court deems proper.

## COUNT II
### Plaintiff, Christine Lynn Finkbeiner, et al. v. All Defendants
### VIOLATION OF THE EQUAL PROTECTION CLAUSE

69.     Paragraphs 1 through 68 are hereby incorporated by reference as though the same were fully set forth at length herein.

70.     The equal protection clause of the Fourteenth Amendment guarantees

that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

71.    The Defendant's actions in granting religious exemptions to employees who have a sincerely held religious belief that does not allow them to participate in the study of EUA approved only "vaccines" by granting conditional approvals which require Plaintiffs to subject themselves on a regular basis to a carcinogen and having to be quarantined for 14 days if exposed to a person who has tested positive for COVID-19 is a violation of the Equal Protection Clause.

72.    Plaintiffs believe and therefore aver that the Defendants are treating unvaccinated employees with a sincerely held religious belief that does not allow them to be injected with one of the three EUA approved only "vaccines" differently than vaccinated employees.

73.    The science now demonstrates that vaccinated individuals spread COVID-19 infections just as much as unvaccinated individuals, if not more so.

74.    The Lancet published a study entitled, "Community transmission and viral load kinetics of the SARS-CoV-2 delta (B.1.617.2) variant in vaccinated and unvaccinated individuals in the UK: a prospective, longitudinal, cohort study." That study concluded the following, "Notwithstanding, these findings indicate continued risk of infection in household contacts **despite vaccination**. Our estimate of SAR is higher than that reported in fully vaccinated household contacts exposed before

the emergence of the delta variant.  The time interval between vaccination and study recruitment was significantly higher in fully vaccinated PCR-positive contacts than fully vaccinated PCR-negative contacts suggesting that susceptibility to infection increases with time as soon as 2-3 months **after vaccination**—consistent with waning protective immunity.

75.    The Hill wrote an article on October 27, 2021 titled *Vaccinated just as likely to spread delta variant within household as unvaccinated: study* by Caroline Vakil which states, "People who have received COVID-19 vaccinations **are able to spread the delta variant within their household despite their vaccination status just as easily as unvaccinated individuals**, a new study published on Friday shows."

76.    Attorney Elizabeth Brehm, made a Freedom of Information Act (FOIA) request to the CDC on September 02, 2021, seeking: "Documents reflecting any documented case of an individual who: (1) never received a COVID-19 vaccine; (2) was infected with COVID-19 once, recovered, and then later became infected again; and (3) transmitted SARS-CoV-2 to another person when reinfected."  In response to this request, the CDC's letter dated November 5, 2021 states, "A search of our records failed to reveal any documents pertaining to your request. The CDC Emergency Operations Center (EOC) conveyed that this information is not collected."

77.    As you can see from the CDC's response, they do not have **any data** that shows that unvaccinated individuals who were previously infected with SARS-CoV-2 can transmit the virus to others.

78.    The current information from the Lancet, as well as other medical periodicals, clearly shows that the "vaccines" are neither safe or effective. The Lancet published correspondence entitled, "Transmissibility of SARS-CoV-2 among fully vaccinated individuals" on January 1, 2022, which stated "A prospective cohort study in the UK by Anika Singanayagam and colleagues [2] regarding community transmission of SARS-CoV-2 among unvaccinated and vaccinated individuals provides important information that needs to be considered in reassessing vaccination policies. This study showed that the impact of vaccination on community transmission of circulating variants of SARS-CoV-2 appeared to be not significantly different from the impact among unvaccinated people.[2][3] The scientific rationale for mandatory vaccination in the USA relies on the premise that vaccination prevents transmission to others, resulting in a "pandemic of the unvaccinated". [4] Yet, the demonstration of COVID-19 breakthrough infections

---

[2] https://1027kearneymo.com/kpgz-news/2020/11/9/covid-tests-may-inflate-numbers-by-picking-up-dead-virus (last visited July 15, 2021)

[3] Wilder Smith A What is the vaccine effect on reducing transmission in the context of the SARS-CoV-2 delta variant? *Lancet Infect Dis.* 2021; (published online Oct 29.

[4] Tayag Y Stop calling it a pandemic of the unvaccinated. The Atlantic. https://www.theatlantic.com/ideas/archive/2021/09/persuade-unvaccinated-protect-unvaccinated/620091/ Date: Sept 21, 2021

among fully vaccinated health-care workers (HCW) in Israel, who in turn may transmit this infection to their patients,[5] requires a reassessment of compulsory vaccination policies leading to the job dismissal of unvaccinated HCW in the USA. Indeed, there is growing evidence that peak viral titres in the upper airways of the lungs and culturable virus are similar in vaccinated and unvaccinated individuals.[2,3,5–7] Thus, the current evidence suggests that current mandatory vaccination policies might need to be reconsidered, and that vaccination status should not replace mitigation practices such as mask wearing, physical distancing, and contact-tracing investigations, even within highly vaccinated populations." Requiring only unvaccinated employees who have been granted religious exemptions to the EUA approved only "vaccines" to get tested twice weekly violates the Plaintiffs right to equal protection under the law in which to practice their sincerely held religious beliefs.

---

[2]  https://1027kearneymo.com/kpgz-news/2020/11/9/covid-tests-may-inflate-numbers-by-picking-up-dead-virus  (last  visited July 15, 2021)

[3] Wilder Smith A What is the vaccine effect on reducing transmission in the context of the SARS-CoV-2 delta variant? *Lancet Infect Dis.* 2021; (published online Oct 29.)

[5] Bergwerk M Gonen T Lustig Y et al. COVID-19 breakthrough infections in vaccinated health care workers. *N Engl J Med.* 2021; 385: 1474-1484

[6] Hagan LM McCormick DW Lee C et al. Outbreak of SARS-CoV-2 B.1.617.2 (delta) variant infections among incarcerated persons in a federal prison—Texas, July–August 2021. *MMWR Morb Mortal Wkly Rep.* 2021; 70: 1349-1354

[7] Acharya CB Schrom J Mitchell AM et al. No significant difference in viral load between vaccinated and unvaccinated, asymptomatic and symptomatic groups infected with SARS-CoV-2 delta variant. *medRvix.* 2021; (pub online Sept 29.) (preprint).

## COUNT III
**Plaintiff, Christine Lynn Finkbeiner, et al. v. All Defendants**
**FAILURE TO PROVIDE REASONABLE ACCOMMODATION**

79.    Paragraphs 1 through 78 are hereby incorporated by referenced as though the same were fully set forth at length herein.

80.    42 U.S.C.  §2000e requires employers to provide "reasonable accommodations" to employees who request a religious exemption.

81.    The Defendants are required to make reasonable accommodations to the religious needs of the employees short of "undue hardship."  Furthermore, the vaccinations currently available in the United States are "EUA approved" only under 21 U.S.C. §360bbb-3.

82.    21 U.S.C.  §360bbb-3(e)(1)(A)(ii) states, "Appropriate conditions designed to ensure that individuals to whom the product is administered are informed—(III) of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks."

83.    In the present case, Finkbeiner and other similarly situated employees requested a religious exemption from the EUA approved only "vaccines."  The Defendant(s) granted each of the employees' religious exemptions with a conditional approval.

84.    Following the notification of the conditional approval, the Defendant(s)

advised each of the employees of the conditions of their approval, which included submitting to a PCR Test or Antigen Test as stated above.

85.     Submission to a PCR Test or Antigen Test twice a week is not a reasonable accommodation as it is only required of the individuals that requested a religious exemption to the EUA approved only "vaccines."

86.     As identified above, individuals that are vaccinated are just as likely, if not more so, to contract and/or spread COVID-19.   Therefore, the Defendants actions in requiring only the unvaccinated employees that requested a religious exemption to the EUA approved only "vaccines" to submit to PCR or Antigen Tests twice weekly is not a reasonable accommodation.

WHEREFORE, Plaintiffs demand judgment against Defendants for lost pay and benefits, lost future pay and benefits, compensatory damages, punitive damages, nominal damages, attorney's fees and costs, interest, and all other relief which this Court deems proper.

**COUNT IV**
**Plaintiff, Christine Lynn Finkbeiner, et al. v. All Defendants**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

87.     Paragraphs 1 through 86 are hereby incorporated by reference as though the same were fully set at length herein.

88.     Finkbeiner and other similarly situated employees suffered great emotional distress as a result of the vaccine mandate and the conditional approval

requiring the use of nasal swabs containing ethylene oxide.

89.    Plaintiff believes and therefore avers that the Defendants knew or reasonably should have known that the EUA approved only "vaccines" were neither safe nor effective in preventing the transmission of COVID-19 in August 2021.

90.    At that time, studies had already been released such as the one performed by J. Bart Classen that was published on or around August 25, 2021.  J. Bart Classen issued a peer review study in the magazine, *Trends in Internal Medicine*, which reviewed the scientific data of each of the EUA approved only "vaccines"; Moderna, Pfizer, and Janssen.   Dr. Classen, an immunotherapy physician, reviewed the data using the appropriate scientific data endpoint. (See Dr. Classen's study attached hereto at **Exhibit G**).  Dr. Classen's study concluded, "Based on this data it is all but a certainty that mass COVID-19 immunization is hurting the health of the population in general.  Scientific principles dictate that the mass immunization with COVID-19 vaccines must be halted immediately because we face a looming vaccine induced public health catastrophe."

91.    Despite peer review studies of this nature and despite the fact that Geisinger was under no obligation to impose a vaccine mandate, they required their employees to receive one of the EUA approved only "vaccines" or be fired.

92.    During the process of reviewing the religious and medical exemptions filed by employees in September and October 2021, additional information

continued to develop regarding the efficacy of the "vaccines." At that time, the CDC Director, Dr. Rochelle Walensky, stated that the COVID-19 "vaccines" are not able to prevent individuals from being infected with COVID-19 and/or from transmitting the COVID-19 virus to other individuals. (See the video initially posted by Dr. Robert Malone on Twitter in October 2021, now copied to this site - https://web.telegram.org/z/#1541599283). Former CDC Director, Robert Redfield, had also stated that during one 6 to 8 week period 40% of the individuals who died with COVID-19 in the State of Maryland were fully vaccinated. The World Health Organization Chief Scientist, Dr. Soumya Swaminathan, had also stated that we don't have enough evidence to be confident that the COVID-19 "vaccines" that are currently available prevent people from getting infected with COVID-19 or prevent people from transmitting COVID-19 to other individuals. Despite all this information that has been released, the Defendants continued to require that their employees either receive the EUA approved only "vaccine" or receive a religious or medical exemption.

93.    The above-named Defendants are part of a medical organization which purports to be concerned about the safety of the patients, staff, and visitors. Due to the fact that the Defendants are in the health field, they knew or reasonably should have known that the EUA approved only "vaccines" were neither safe nor effective when they implemented the mandate.

94.     Plaintiffs believe and therefore aver that the above-named Defendants knew that the CDC had issued a memorandum on July 21, 2021 withdrawing their approval of PCR antigen tests to detect COVID-19. (See the CDC Memorandum as **Exhibit E**).

95.     Despite the memorandum from the CDC, the Defendants mandated that their employees, like Finkbeiner and the other similarly situated employees be subjected to a nasal swab twice a week using the PCR antigen tests.

96.     Plaintiffs believe and therefore aver that the above-named Defendants knew or reasonably should have known, that the use of nasal swabs can lead to injuries such as damage to the nasal passage, damage to the brain, cancer, or possible CSF leak.

97.     The above-named Defendants knew or reasonably should have known, that both tests they were mandating for Finkbeiner and other employees of Geisinger contained ethylene oxide, a carcinogen.

98.     Plaintiff believes and therefore avers that the above-named Defendant knew or reasonably should have known, that Finkbeiner and other employees of Geisinger would research the nasal swabs in light of the fact that they are part of the medical field and would discover that the nasal swabs contained ethylene oxide, a carcinogen.

99.     Plaintiff believes and therefore avers that the above-named Defendants

knew that Finkbeiner and other similarly situated employees would discover the Puritan memorandum showing that ethylene oxide is "toxic".   (See **Exhibit H** attached hereto.)

100.   The above-named Defendants knew or reasonably should have known that Finkbeiner and the other Plaintiffs would research and discover the handout from the National Institute of Health and the National Cancer Institute stating that ethylene oxide is a carcinogen that should not come into contact with your skin.

101.   Plaintiff believes and therefore avers that Geisinger intentionally inflected emotional distress on its employees by requiring them to either be subjected to either an EUA approved only "vaccine" or swabbing their nasal passage twice weekly.

WHEREFORE, Plaintiffs demand judgment against Defendants for lost pay and benefits, lost future pay and benefits, compensatory damages, pain and suffering, punitive damages, nominal damages, attorney's fees and costs, interest, and all other relief which this Court deems proper.

**<u>COUNT V</u>**
**Plaintiff, Christine Lynn Finkbeiner, et al. v. All Defendants**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

102.   Paragraphs 1 through 101 are hereby incorporated by reference as though the same were fully set forth at length herein.

103.   Geisinger knew or reasonably should have known that forcing their

employees to participate in EUA approved only "vaccines" that were neither safe nor effective would cause emotional distress to their employees.

104.   The above-named Defendants knew or reasonably should have known that requiring their employees to swab their nose twice a week using a test that was no longer approved by the CDC to detect COVID-19 and which contained the chemical ethylene oxide would cause emotional distress to Finkbeiner and other similarly situated employees.

105.  Defendants negligently inflicted emotional distress when they mandated EUA approved only "vaccines" and swabbing with nasal swabs containing ethylene oxide twice weekly.

WHEREFORE, Plaintiffs demand judgment against Defendants for lost pay and benefits, lost future pay and benefits, compensatory damages, pain and suffering, punitive damages, nominal damages, attorney's fees and costs, interest, and all other relief which this Court deems proper.

<u>**COUNT VI**</u>
**Plaintiff, Christine Lynn Finkbeiner, et al. v. All Defendants**
**THE VACCINATION ORDERS VIOLATE**
**PETITIONER'S CIVIL RIGHTS–42 U.S.C. §1983**
**PROCEDURAL DUE PROCESS–DEPRIVATION OF PROPERTY**

106.   Paragraphs 1 through 105 are hereby incorporated by reference as though the same were fully set forth at length herein.

107.   The Fifth Amendment to the United States Constitution, applicable to

the states by the Fourteenth Amendments to the United States Constitution prohibits the states from depriving "any person of life, liberty, or property, without due process of law."

108.   Art. I § 3 of the Pennsylvania Constitution, "All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; no man can of right be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent; no human authority can, in any case whatever, control or interfere with the rights of conscience, and no preference shall ever be given by law to any religious establishments or modes of worship."

109.   Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage ... subjects, or causes to be subjected, any citizen ... or other person ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured, ..." 42 U.S.C. § 1983.

110.   "To establish liability under 42 U.S.C. § 1983, a plaintiff must show that the defendants, acting under color of law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused the complained of injury." *Elmore v. Cleary,* 399 F.3d 279, 281 (3d Cir.2005) (citing *Sameric Corp. of Del., Inc. v. City of Phila.,* 142 F.3d 582, 590 (3d Cir.1998)).

111.   To prevail on her § 1983 claims, a plaintiff must demonstrate that she was deprived of a federal constitutional or statutory right by an individual acting under color of state law. *See Kach v. Hose,* 589 F.3d 626, 646 (3d Cir.2009).

112.   There is no "simple line" between state and private actors. *Brentwood Acad. v. Tenn. Second Sch. Athletic Ass'n,* 531 U.S. 288, 295, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001). And, "[a]lthough little is straightforward in determining whether a private actor has acted 'under color of state law,' one directive emerges clearly from the Supreme Court's jurisprudence: the facts are crucial."

113.   The Third Circuit has thus articulated "three broad tests" to determine if a private defendant is a state actor: (1) whether the defendant exercised powers that are "traditionally the exclusive prerogative of the state;" (2) whether the defendant acted "with the help of or in concert with state officials;" or (3) whether the "state has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity [.]" *Kach v. Hose,* 589 F.3d 626, 646 (3d Cir.2009) (citing *Mark v. Borough of Hatboro,* 51 F.3d 1137, 1142 (3d Cir.1995)).

114.   In the present case, only the Department of Health and/or the Governor has the authority to implement a vaccine mandate in the Commonwealth of Pennsylvania.

115.   Section 2102(a) of the Administrative Code, entitled "General health

administration," enumerates the duties of the Department of Health, among which are the duties "[t]o protect the health of the people of this Commonwealth, and to determine and employ the most efficient and practical means for the prevention and suppression of disease[.]" 71 P.S. § 532(a).

116.   The Administrative Code further states, in the section entitled "Duty to protect health of the people," that "[i]t shall be the duty of the Department of Health to protect the health of the people of the State, and to determine and employ the most efficient and practical means for the prevention and suppression of disease." Section 8 of the Act of April 27, 1905, P.L. 312, 71 P.S. § 1403(a).

117.   The Defendants took on the role of the state in implementing a vaccine mandate in August of 2021.

118.   As such, the Defendants were acting under color of state law.

119.   Furthermore, Plaintiff believes and therefore avers that the Defendants acted in concert with federal officials by implementing the vaccine mandate as a result of the CDC's recommendations and the recommendations of other federal officials such as Dr. Anthony Fauci.

120.   Plaintiff and other similarly situated employees have a property right in continued employment. *Matter of Rivera v Beekman*, 86 AD2d 1, 9, 448 N.Y.S.2d 492 (1st Dept 1982.) "[I]t is now well settled that a temporary, nonfinal deprivation of property is nonetheless a 'deprivation' in the terms of the Fourteenth Amendment.

. . . The Fourteenth Amendment draws no bright lines around three-day, 10-day or 50-day deprivations of property." *Snead v. Dep't of Soc. Servs.*, 355 F. Supp.764, 771 (S.D.N.Y. 1973).

121.  Finkbeiner and similarly situated employees have lost their employment as a result of the Defendants' illegal mandate and subsequent conditional approval.

122.  This is a punishment intended to cause humiliation and financial hardship.

WHEREFORE, Plaintiffs demand judgment against Defendants for lost pay and benefits, lost future pay and benefits, compensatory damages, punitive damages, nominal damages, attorney's fees and costs, interest, and all other relief which this Court deems proper.

### Jury Demand

Plaintiff demands a jury trial on all issues triable by jury.

Dated:  July 22, 2022                    **STAPP LAW, LLC**

By: */s/ Gregory A. Stapp*
Gregory A. Stapp, Esquire
Attorney ID No. 78247
153 West Fourth Street, Suite 6
Williamsport, PA 17701
Tel. (570) 326-1077
Email: gstapp@stapplaw.net
*Counsel for Plaintiffs*

36

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 22nd day of July, 2022, I electronically filed the foregoing **Third Amended Complaint** with the Clerk of Court by using the CM/ECF filing system which will send notification of electronic copy to the following:

> Anthony (T.J.) Andrisano, Esquire
> Jill M. Lashay, Esquire
> Jared L. Pickell, Esquire
> Jacob J. Sulzer, Esquire
> Buchanan Ingersoll & Rooney, PC
> 409 North Second Street, Suite 500
> Harrisburg, PA 17101
> Email: Anthony.andrisano@bipc.com
> Email: Jill.lashay@bipc.com
> Email: Jared.pickell@bipc.com
> Email: Jacob.sulzer@bipc.com
> *Counsel for Defendants*

> */s/ Gregory A. Stapp*
> Gregory A. Stapp, Esquire
> *Counsel for Plaintiffs*